UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| N. JAMES VALENTINE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| VS. | : | CIVIL ACTION NO. |
| | : | 3:03CV153 (DJS) |
| NATIONAL SPORTS SERVICES, | : | |
| SMASH MOUTH SPORTS, SCOTT | : | |
| SPREITZER, JIM FEIST SPORTS, JIM | : | |
| FEIST, JOHN DOES 1-5 and XYZ | : | |
| CORPORATIONS 1-5 (such names | : | |
| being fictitious), | : | |
| | : | |
| Defendants. | : | JULY 6, 2004 |

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION.................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND................................................3

I.    The Parties .................................................................................3

II.    Valentine's Purchase of Services from Defendants.............................................4

ARGUMENT .................................................................................... 9

I.    Summary Judgment Standard .................................................................... 9

II.    No Viable Cause of Action Has Been Asserted against the Individual Defendants ....... 10

III.    Valentine's Claims are Barred Under a Binding Covenant Not To Sue....................... 11

IV.    Puffery and Representations Regarding Inherently Uncertain Future Events Cannot Form the Foundation of a Misrepresentation Claim .................. 13

V.    Valentine's CUTPA Claim is Without Merit ................................................. 19

    A.    Valentine Points to No Public Policy that Defendants Violated......................... 20

    B.    Defendants' Conduct is Not Immoral, Unethical, Oppressive or Unscrupulous........................................................... 21

    C.    Valentine Does Not Meet the Third Prong because He Could Have Reasonably Avoided Any Alleged Injury ............................... 23

VI.    Defendants Did Not Breach any Contract....................................................... 26

CONCLUSION ................................................................................... 28

i

## TABLE OF AUTHORITIES

A-G Foods, Inc. v. Pepperidge Farm, Inc.,
      216 Conn. 200, 579 A.2d 69 (1990) ........................................................... 20, 24

Alderman v. SCJ, Inc.,
      2003 Conn. Super. LEXIS 71, Dkt. No.
      CV020460404S (Conn. Super. Ct. Jan. 9, 2003) ........................................... 24

Anderson v. Liberty Lobby, Inc.,
      477 U.S. 242 (1986) ..................................................................................... 10

Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc.,
      187 Conn. 544 (1982) ................................................................................... 11

Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,
      581 F. Supp. 241 (S.D.N.Y. 1984) .............................................................. 12, 13

Boulevard Assocs. v. Sovereign Hotels, Inc.,
      72 F3d. 1029 (2d Cir. 1995) .......................................................................... 25

Bowman v. Hartig,
      334 F. Supp. 1323 (S.D.N.Y. 1971) ............................................................ 16, 17

Brookhaven Housing Coalition v. Solomon,
      583 F.2d 584 (2d Cir. 1978) .......................................................................... 26

Bruce v. Home Depot, U.S.A., Inc.,
      308 F. Supp. 2d 72 (D. Conn. 2004) ............................................................ 13

Celotex Corp. v. Catrett,
      477 U.S. 317 (1986) .................................................................................... 9, 10

Cheshire Mortg. Serv. v. Montes,
      223 Conn. 80 (1992) ..................................................................................... 21

City of Bridgeport v. Aerialscope, Inc.,
      122 F. Supp. 2d 275 (D. Conn. 2000) .......................................................... 20

Coady v. Martin,
      65 Conn. App. 758 (2001) ........................................................................... 26, 27

Cohen v. Koenig,
    25 F.3d 1168 (2d Cir. 1994) ....................................................................... 14

Crawford-El v. Britton,
    523 U.S. 574 (1998) ............................................................................... 9, 10

Darvin v. Bache Halsey Stuart Shields, Inc.,
    479 F. Supp. 460 (S.D.N.Y. 1979) ........................................................... 16

D'Ulisse-Cupo v. Bd. of Dir. of Notre Dame High School,
    202 Conn. 206 (1987) ............................................................................... 14

Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.,
    41 Conn. Supp. 575 (1991) ....................................................................... 25

Farrah v. Acker,
    1998 Conn. Super. LEXIS 1612, Dkt. No. CV950555890S
    (Conn. Super. Ct. May 27, 1998) .............................................................. 24

Hershfang v. Citicorp,
    767 F. Supp. 1251 (S.D.N.Y. 1991) ..................................................... 15, 22

Heyman Assocs. No. 1 v. Ins. Co. of Pa.,
    231 Conn. 756 (1995) ............................................................................... 12

Hipsky v. Allstate Ins. Co.,
    304 F. Supp. 2d 284 (D. Conn. 2004) ...................................................... 26

Hunter Douglas, Inc. v. Comfortex Corp.,
    1999 U.S. Dist. Lexis 10906, Dkt. No.
    98-CV-0479 (LEK/DNH) (N.D.N.Y. March 11, 1999) ............................. 12

Hunter Envtl. Serv., Inc. v. Hunter Envtl. Serv.,
    921 F. Supp. 914 (D. Conn. 1996) ........................................................... 15

Hydro Investors, Inc. v. Trafalgar Power, Inc.,
    227 F.3d 8 (2d Cir. 2000) ......................................................................... 14

L&R Realty v. Connecticut Nat'l Bank,
    53 Conn. App. 524 (1999) .................................................................. 26, 27

Lasker v. N.Y.S. Elec. & Gas Corp.,
    85 F.3d 55 (2d Cir. 1996) ................................................................... 15, 22

ii

Lee v. BSB Greenwhich Mortg. L.P.,
    267 F.3d 172 (2d Cir. 2001) ........................................................................... 12

Levanthal v. Tow,
    48 F. Supp. 2d 104 (D. Conn. 1999) .............................................................. 16

Levine v. Massey,
    232 Conn. 272, 279 (1995) ............................................................................12

Locascio v. Mueller,
    2004 Conn. Super. LEXIS 875, Dkt. No. CV 030089395S
    (Conn. Super. Ct. March 30, 2004) ............................................................... 24

Mashantucket Pequot Tribe v. Connecticut,
    913 F.2d 1024, 1031 (2d Cir. 1990) .............................................................. 21

Minally v. Arrow Home Inspections,
    2002 Conn. Super. LEXIS 3670, Dkt. No. CV 020345083S
    (Conn. Super. Ct. Nov. 19, 2002) ............................................................ 21, 22

Newman v. Rothschild,
    651 F.Supp. 160 (S.D.N.Y. 1986) ................................................................. 16

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000) .......................................................................... 15

Ormsby v. Nationwide Mut. Fire Ins. Co.,
    2000 Conn. Super. Lexis 1318, Dkt. No. CV 990429984
    (Conn. Super. Ct. May 25,2000) ................................................................... 14

Raab v. General Physics Corp.,
    4 F.3d 286 (4th Cir. 1993) ............................................................................. 17

Rotstein v. Reynolds & Co.,
    359 F. Supp. 109 (N.D. Ill. 1973) ................................................................. 16

San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996) .................................................................. 15, 17, 22

Waxman v. Envipco Pick Up & Processing Services Inc.,
    2003 U.S. Dist. LEXIS 19295, Dkt. No. 02 Civ. 10132 (GEL)
    (S.D.N.Y. October 23, 2003) ........................................................ 15, 17, 18, 22

iii

Web Press Services Corp. v. New London Motors, Inc.,
  205 Conn. 479 (1987) ................................................................................................ 23

Williams Ford, Inc. v. Hartford Courant Co.,
  232 Conn. 559 (Conn. 1995) ............................................................................ 18, 21, 24

Zaist v. Olson,
  154 Conn. 563 (1967) ................................................................................................ 11

Zerman v. Ball,
  735 F.2d 15 (2d Cir. 1984) ......................................................................................... 16

iv

## INTRODUCTION

Plaintiff N. James Valentine ("Valentine") has actively gambled and lost for more than 30 years. The only difference between his other losses over the years and the $8,000 net loss at issue here is that during the relevant four-month period, Valentine purchased sports information and handicapping services from the Corporate Defendants before making his bets with unrelated third parties. Defendants have long experience and an award-winning reputation in the Las Vegas sports information community, but, as Valentine has acknowledged, cannot foretell the future and never claimed otherwise. Instead, the Corporate Defendants provided Valentine with exactly what he purchased – predictions based on thorough sports knowledge, years of experience and recognized judgment. Valentine's claims here are particularly quixotic given that he settled such alleged claims shortly after the transactions at issue took place pursuant an agreement by which he was refunded part of his payments for the Corporate Defendant's services. Valentine has no legal theory on which the undisputed facts could entitle him to relief, but merely the losing gambler's hope that one more roll of the dice may somehow pay off with a windfall. Summary judgment should be granted for Defendants.

Valentine initiated this proceeding in January 2003. Following dismissal of Valentine's original complaint due to its "fundamental defects," and subsequent motion practice, Valentine filed his Second Amended Complaint in October 2003, alleging four purported causes of action relating to his purchase of sports handicapping services from the Corporate Defendants in the latter half of 2000: (1) a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq. ("CUTPA"); (2) fraudulent misrepresentation; (3) negligent

1

misrepresentation; and (4) breach of contract. Valentine cannot support any such causes of action, and Defendants are therefore entitled to judgment as a matter of law.

Accordingly, National Sports Services, Smash Mouth Sports and Jim Feist Sports (the "Corporate Defendants") and defendants Scott Spreitzer and Jim Feist (the "Individual Defendants") (collectively, the Corporate Defendants and Individual Defendants will be referred to as the "Defendants"), hereby respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. There are no material issues of fact and defendants are entitled to summary judgment on the following grounds:

- Valentine had no relevant contact whatsoever with the Individual Defendants, and thus has no basis for sustaining a cause of action against them in their individual capacities.

- Valentine is barred from asserting any claims against the Corporate Defendants as a result of an unambiguous covenant not to sue that he executed in December 2000 by which Valentine obtained a $5,000 refund from the Corporate Defendants in exchange for his agreement to take no further action against the Corporate Defendants.

- Valentine's alleged causes of action are without merit even leaving aside this covenant not to sue. First, the alleged statements upon which Valentine bases his fraudulent and negligent misrepresentation claims amount to nothing more than unactionable puffery and predictions of inherently uncertain future events that, as a matter of black letter law, cannot form the basis for a misrepresentation claim. Second, Valentine has not established a CUTPA claim because he cannot meet any of the three CUTPA criteria for establishing unfairness. Finally, Valentine's breach of contract claim cannot even clear the initial hurdle of proving definite and enforceable contract terms, and the undisputed facts make clear that Defendants fully provided the services Valentine purchased.

2

## FACTUAL AND PROCEDURAL BACKGROUND

I.     The Parties

Valentine has been an active gambler for over 30 years.  (Transcript of the Deposition of Nicholas James Valentine (the "Depo. Tr.") at 7 (the relevant pages of which are attached as Exhibit A to the Declaration of Chad A. Landmon (the "Landmon Dec."), submitted concurrently herewith).)  Over this period (and up to today), Valentine has gambled through poker games, the lottery, casino games and sports betting through both offshore bookmaking companies and, currently, through a local bookmaker.  (Id. at 7-15.)

Having gambled on sporting events for more than half of his life, Valentine understands and acknowledges that "gambling on sporting events is risky," that predicting the outcome of a sporting event is difficult and that, of course, it is impossible to know in advance the winner of a sporting event.  (Id. at 19.)  Valentine's appreciation of the risks of sports gambling has been forged in part through his experience of "usually los[ing]," on roughly 60 percent of his many bets over the years.  (Id. at 19-20.)

National Sports Services was founded in 1976 and is one of the nation's largest providers of sports information and handicapping services.  (Landmon Dec. Ex. C.)  Jim Feist Sports and Smash Mouth Sports are wholly-owned divisions of National Sport Services.  The Individual Defendants, Jim Feist and Scott Spreizer, are sports gaming experts and handicappers who are retained as independent contractors for National Sports Services.  National Sports Services, along with Jim Feist Sports and Smash Mouth Sports, publishes numerous magazines, workbooks and articles, providing detailed information and statistics to the sports gaming community, including

3

the Jim Feist Pro Football Annual and the Jim Feist College Football Annual. (Id.) In addition, the Corporate Defendants produce Proline, the longest running television handicapping show in the United States, which appears weekly during the football season and features many of the country's leading sports handicappers. (Id.) The Defendants are nationally renowned for their expertise in the sports handicapping and information services industry. (Landmon Dec. ¶¶ 6-12 and Exs. D to J.)

II.     Valentine's Purchase of Services from Defendants

After a long history of gambling, Valentine first learned about the services offered by the Corporate Defendants through an advertisement for Jim Feist Sports in Pro Football Weekly magazine in September 2000. (Depo. Tr. at 27.) This advertisement offered to provide a free prediction for a college football game for people who called a toll-free number. (Id.) Valentine called this number, and received the free pick from a tape recording. (Id.) Valentine did not gamble based on the free prediction, which he discovered did not correctly foresee the outcome of the game. (Id. at 30.)

Following this initial contact, Valentine received a telephone solicitation from a Smash Mouth Sports telemarketer. (Id. at 27.) In making his sales pitch, this individual offered to sell Valentine a "sure thing" prediction for a professional football game for $100. (Id. at 33-34.) Valentine agreed to purchase this pick, but, recognizing the "somewhat difficult" nature of predicting the outcome of a sporting event, Valentine again decided not to gamble on this pick; instead, he "[j]ust wanted to see if it was accurate." (Id.) Unlike the prior pick, this pick successfully predicted the ultimate outcome of the football game. (Id. at 34.)

4

After this initial purchase, Valentine began purchasing a variety of sports advisory services from the Corporate Defendants from September 2000 through December 2, 2000. (Landmon Dec. Ex. K, NSS 000053 – NSS 000054.)  These handicapping services included picks for college football and basketball, professional football and basketball and professional baseball.  (Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 13.)  In total, Valentine paid the Corporate Defendants approximately $100,000 for such handicapping services.[1] (Landmon Dec. Ex. K, NSS 000053 – NSS 000054.)  Valentine authorized all charges for his purchases from the Corporate Defendants, and does not claim that he was wrongly charged for any services.  (Depo. Tr. at 140-41.)

Valentine does not recall the dates or details of any calls with Defendants' sales staff, but has claimed at various times that such representatives made various general statements, largely concerning future events, in their sales pitches.[2]  These include an alleged statement by a representative from one of the Corporate Defendants that, "they were the best of the best, Jim Feist was a world champion handicapper, you'll be coming to Vegas, and riding in limos, and drinking the best wine . . . ."  (Id. at 40-41.)  Valentine has similarly claimed that representatives told him, "You will make a lot of money with these picks," "You will have $40,000 in your account within 2 months," "You'll be making $5,000 to $10,000 dollar bets and winning," "You'll be driving around in a limo and living the good life with the winnings that you will have

_____

1 Although there has been some discrepancy as to the amount Valentine paid the Corporate Defendants, the exact amount is not material for purposes of this motion.

2 Defendants assume for the purposes of this motion only that a reasonable fact-finder could conclude that these alleged statements were made.

from these picks," "You'll be making $50,000 dollar bets and winning" and "You can bet with the utmost confidence if you pay for our services." (Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 11.)

Valentine readily admits, however, that the Corporate Defendants did not – and could not – actually know who would win the sporting events for which they provided picks, and that the representatives from the Corporate Defendants merely made predictions regarding how well the picks might do in the future. (Depo. Tr. at 49, 131.) In contrast to the prototypical selling statements described above, on certain occasions, the Corporate Defendants made express guarantees to Valentine relating to his purchases.  For example:

- On September 25, 2000, Valentine made a purchase for $2,060 from Smash Mouth Sports. (Landmon Dec. Ex. L, NSS 000010 – NSS 000012.)  This purchase had a balance due of $2,160. (Id.) However, under an express guarantee, Valentine was only required to pay the balance if he was up by $9,720 by November 15, 2000. (Id.) Because Valentine was up by roughly $14,000 to $20,000 by November 15, the guarantee was met, and he paid the $2,160 balance. (Depo. Tr. at 74-76.)

- On October 21, 2000, Valentine made a purchase of $4,500 from Jim Feist Sports. (Landmon Dec. Ex. M, NSS 000032 – NSS 000033.) This purchase had a balance due of $4,500. (Id.) However, under an express guarantee, Valentine was only required to pay the balance if he was up by ten times his investment, or $45,000, by November 30, 2000. (Id.) Because Valentine was not up by $45,000 by November 30, the guarantee was honored, and Valentine did not pay the $4,500 balance. (Depo. Tr. at 76-78.)

- On October 25, 2000, Valentine made a purchase of $10,342 from Jim Fest Sports. (Landmon Dec. Ex. N, NSS 000038 – NSS 000040.) This purchase had a balance due of $18,532. (Id.) However, under an express guarantee, Valentine was only required to pay the balance if he was up by $72,185 by January 31, 2001. (Id.) Because Valentine was not up by $72,185 by January 31, the guarantee was honored, and Valentine did not pay the $18,532 balance. (Depo. Tr. at 78-79.)

6

Thus, when the Corporate Defendants made express guarantees to Valentine in relation to his purchases, such guarantees were honored. Valentine does not allege otherwise.

Valentine cannot recall any specific sporting events that he bet on using picks from Defendants, but claims that he relied on such picks in all of his sports-related bets from about September 21, 2000 to January 27, 2001, which he placed with offshore bookmaking companies using accounts he established for this purpose. (Depo. Tr. at 38-39, 68-69; Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 10.) Valentine initially made over $24,000 in one of his offshore accounts in the first eight weeks of gambling using the Corporate Defendants' picks, but ultimately lost the majority of the $8,000 that he had deposited into the offshore accounts. (Depo. Tr. at 95-96; Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 10.) This $8,000 was the sum total of Valentine's losses on bets made using Defendants' picks.[3] (Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 10.)

After Valentine's gambling luck had taken this turn for the worse, he voiced his concerns with the Corporate Defendants regarding the quality of their sports predictions. (Depo. Tr. at 98-99.) Valentine directed his complaints to Tom Marguglio, a Sales Manager for National Sports Services. (Id.) After Marguglio and Valentine discussed Valentine's situation, Valentine executed a December 12, 2000 agreement with the Corporate Defendants pursuant to which, in

---

3 It appears that Valentine's losses were a result more of the transaction fees associated with Valentine's frequent betting rather than any issues with the quality of the picks. Valentine testified in his deposition that the offshore bookmaking companies he used to place bets retained a 10% "vigorish," or commission, on all bets. (Depo. Tr. at 39.) It appears that Valentine gambled in excess of $200,000 with these offshore firms during the relevant period, which suggests that Valentine paid estimated commissions of $20,000, substantially in excess of Valentine's claimed $8,000 loss. (Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 15.) In other words, Valentine would have enjoyed a positive balance from his bets but for the relevant transaction fees.

7

exchange for a refund of $5,000, Valentine stipulated that he would "take no further action on any charges [he] may have incurred" on credit cards relating to purchases from the Corporate Defendants prior to December 12, 2000. (Landmon Dec. Ex. O, NSS 000002.)  After agreeing to this, Valentine received the $5,000 refund from the Corporate Defendants. (Depo. Tr. at 100-01.)

During the relevant period, Valentine's communications and transactions at issue were conducted exclusively with the Corporate Defendants – the Individual Defendants had no meaningful interaction with Valentine in connection with the relevant events.  Indeed, Valentine has never had any direct contact of any kind with Jim Feist, and his sole telephone conversation with Scott Spreitzer took place subsequently to all of Valentine's purchases of services from the Corporate Defendants, and concerned Valentine's after-the-fact complaints about his poor gambling performance.  (Depo Tr. at 20-21, 122; see also Landmon Dec. Ex. K, NSS 000053 – NSS 000054.)

Although Valentine did not purchase any additional services after settling his dispute with the Corporate Defendants, Valentine continued to gamble based on picks included in his previous purchases until January 27, 2001. (Landmon Dec. Ex.B, Plaintiff's Answer to Interrogatory No. 10.)  After such time, Valentine raised additional complaints with the Corporate Defendants. Valentine then filed suit against the Defendants in state court in New Jersey.  Valentine v. National Sports Services, Dkt. No. L-2494-02.  This case was dismissed without prejudice on October 3, 2002, on the grounds that the court lacked in personam jurisdiction or, in the alternative, under the doctrine of forum non conveniens.  (Landmon Dec. Ex. P.)

8

After the New Jersey action was dismissed, Valentine initiated this proceeding on January

28, 2003.  On April 24, 2003, the Court dismissed the original complaint due to its "fundamental

defects."  After the Court's May 16, 2003 deadline for curing the defects of the initial complaint

had passed, Valentine filed his First Amended Complaint on August 1, 2003 after seeking leave

from the Court to re-open the Judgment.  The First Amended Complaint was substantively

identical to the initial defective Complaint, and Valentine ultimately filed the Second Amended

Complaint on October 24, 2003 in response to Defendants' second motion to dismiss.  The

parties have since engaged in discovery, the period for which closed on June 3, 2004 pursuant to

the Court's May 5, 2004 Order.  By that Order, the parties were directed to file all dispositive

motions by July 5, 2004.[4]

ARGUMENT

I.    <u>Summary Judgment Standard</u>

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

(1986); <u>see also</u> <u>Crawford-El v. Britton</u>, 523 U.S. 574, 600 n.22 (1998).

A party seeking summary judgment bears the initial burden of presenting the relevant

materials demonstrating the absence of a genuine issue of material fact. <u>Crawford-El</u>, 523 U.S.

---

[4] Because the Court was closed on July 5 due to the Independence Day holiday, this motion is timely filed under
Rule 6 of the Federal Rules of Civil Procedure.

9

at 600 n.22; <u>Celotex</u>, 477 U.S. at 323. A party opposing summary judgment, however, cannot

rest on mere denials, but must demonstrate the existence of a genuine, triable issue. <u>Crawford-</u>

<u>El</u>, 523 U.S. at 600.

> A defendant need not prove a negative when it moves for summary judgment on an issue
> that the plaintiff must prove at trial. It need only point to an absence of proof on
> plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that
> there is a genuine issue for trial.'

<u>Celotex</u>, 477 U.S. at 324. "[T]here is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 249 (1986) (stating that, "[i]f the evidence is merely colorable, . . . or

is not significantly probative, . . . summary judgment may be granted") (internal citations

omitted).

II.    <u>No Viable Cause of Action Has Been Asserted against the Individual Defendants</u>

Summary judgment in favor of the Individual Defendants is clearly appropriate because

Valentine has pointed to no action undertaken by the Individual Defendants that could rise to a

viable cause of action. In fact, Valentine readily admits that he had no conversations whatsoever

with Jim Feist. (Depo. Tr. at 20.) Moreover, the only conversation Valentine had with Scott

Spreitzer occurred after Valentine made his final purchase from the Corporate Defendants. (<u>Id.</u>

at 122; <u>see also</u> Landmon Dec. Ex. K, NSS 000053 – NSS 000054.) Thus, Valentine did not rely

upon any statements by the Individual Defendants in deciding to purchase services from the

Corporate Defendants.

Indeed, the Complaint itself alleges no specific conduct of any kind on the part of the

Individual Defendants apart from their alleged managerial roles in the Corporate Defendants.

10

(Complaint ¶¶ 3 and 5.)  It is not enough that the Individual Defendants may have been affiliated with or even managing the Corporate Defendants.  See, e.g., Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc., 187 Conn. 544, 557-58 (1982) (individual who controlled corporate defendant not personally liable where there was no evidence relating to the transaction at issue that the control was "used . . . to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the third party plaintiffs'] legal rights; and . . . that the aforesaid control and breach of duty . . . proximately cause[d] the injury or unjust loss complained of") (brackets and ellipses in original) (quoting Zaist v. Olson, 154 Conn. 563, 575 (1967)).  Accordingly, summary judgment with respect to the Individual Defendants is required.

III.    Valentine's Claims are Barred Under a Binding Covenant Not To Sue

Valentine has already settled his claims with the Corporate Defendants, and thus is barred from advancing his claims here as a matter of law.  After Valentine initially complained to the Corporate Defendants concerning their predictions, the parties entered into an agreement dated December 12, 2000 by which Valentine executed a written covenant not to sue in exchange for a refund of $5,000.  (Landmon Dec. Ex. O, NSS 000002.)  The agreement, which appears on the letterhead of National Sports Services, contains the following pledge by Valentine:

> I hereby authorize all charges made to Jim Feist Sports prior to December 12, 2000. . . . I agree to take no further action on any charges I may have incurred on [various credit cards] with Jim Feist Sports prior to this date, December 12, 2000.

Id. (emphasis added).  Valentine does not dispute that he received the $5,000 refund from the Corporate Defendants, but instead claims that his covenant was intended only to prevent him

11

from advancing claims against his credit card companies to dispute the charges. (Depo. Tr. at 101-02.) Valentine's explanation is both utterly implausible and self-contradictory on its face, as Valentine admits that he had no contemporaneous knowledge of any rights to dispute the charges with his credit card companies. (Id.; see also Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 16.). The Court need not assess Valentine's extrinsic evidence of subjective intent, however, as such evidence is inadmissible to overcome the plain meaning of Valentine's release.

"[A] covenant not to sue is an agreement not to enforce an existing cause of action against another party to the agreement." 66 Am. Jur. 2d Release § 4. The construction and scope of a covenant not to sue should be determined using traditional principles of contract construction. Hunter Douglas, Inc. v. Comfortex Corp., 1999 U.S. Dist. Lexis 10906, at *12, Dkt. No. 98-CV-0479 (LEK/DNH) (N.D.N.Y. March 11, 1999) (attached hereto as Ex. A).

Unless a contract is ambiguous, extrinsic evidence is not to be considered during contract construction. See Lee v. BSB Greenwich Mortg. L.P., 267 F.3d 172, 178 (2d Cir. 2001) ("[W]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms, and resort to parol evidence is not only unnecessary but improper.") (internal citations and punctuation marks omitted) (applying Connecticut law); Levine v. Massey, 232 Conn. 272, 279 (1995); Heyman Assocs. No. 1 v. Ins. Co. of Pa., 231 Conn. 756, 780-81 (1995). As the court in Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 581 F. Supp. 241 (S.D.N.Y. 1984), succinctly stated in granting summary judgment based upon the clear covenant not to sue and rejecting an argument based upon parol evidence:

12

> The Court declines to put such an awkward, illogical and artificial interpretation on a clear and straightforward document. The Court will not strain to find doubt and ambiguity where none exists simply to facilitate the admission of parol evidence. The purpose of introducing such evidence is to clear away confusion, not to generate it.

Id. at 243.

Here, Valentine covenanted "to take no further action" against the Corporate Defendants regarding the services he purchased. There is no ambiguity in the covenant, and its plain meaning should be enforced to preclude Valentine from advancing his claims here. Accordingly, summary judgment on all of Valentine's claims is appropriate.

IV.     Puffery and Representations Regarding Inherently Uncertain Future
        Events Cannot Form the Foundation of a Misrepresentation Claim

Valentine's misrepresentation claims here must be dismissed because the alleged comments of the Corporate Defendants on which Valentine bases these claims constitute no more than "puffery" and opinions as to future events and thus, as a matter of law, fail to rise to the level of fraudulent or negligent misrepresentation.

The elements of a claim for fraudulent representation are: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the person making it;[5] (3) it was made to induce action by the other party; and (4) the other party did so act upon the statement to his or her detriment." Bruce v. Home Depot, U.S.A., Inc., 308 F. Supp. 2d 72, 74-75 (D. Conn. 2004) (citing cases). Claims of negligent misrepresentation must be premised on "justifiable reliance upon [representations], if [the party making the representations] fails to

---

5 Even if Valentine could prove that the Defendants made false representations, which he cannot, his fraudulent misrepresentation claim is defective because there is no evidence whatsoever regarding the Defendants' knowledge of any such falsity.

13

exercise reasonable care or competence in obtaining or communicating the information."
D'Ulisse-Cupo v. Bd. of Dir. of Notre Dame High School, 202 Conn. 206, 217-18 (1987)
(quoting Restatement Second of Torts § 552 (1979)).

Under either claim, it is black letter law that a misrepresentation claim cannot survive
"when [the statements at issue] are mere 'puffery' or are opinions as to future events." Cohen v.
Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) (discussing puffery and promises of future conduct in
the context of a fraudulent misrepresentation claim); see also Hydro Investors, Inc. v. Trafalgar
Power, Inc., 227 F.3d 8, 21 (2d Cir. 2000) (discussing "puffery" and promises of future conduct
in the context of a negligent misrepresentation claim). See generally, Comment a to Restat 2d of
Torts, § 530A (representations concerning future intentions cannot support misrepresentation
claim where such representations are merely "'puffing' statements which are so frequent and so
little regarded in negotiations for a business transaction as to make it unjustifiable for the
recipient to rely upon them.")

Connecticut courts have outlined a number of factors used to determine whether a seller
is merely stating an opinion or engaging in puffery, rather than stating an express warranty.
"These factors include (1) the specificity of the statement, (2) the context, (3) the extent to which
they are qualified, and (4) the reasonableness of the buyer's reliance." Ormsby v. Nationwide
Mut. Fire Ins. Co., 2000 Conn. Super. LEXIS 1318, at *20 n.3, Dkt. No. CV 990429984 (Conn.
Super. Ct. May 25, 2000) (attached hereto as Ex. B).

The Corporate Defendants sell information designed to help gamblers choose their betting
tactics in much the same way that purveyors of financial information services provide

14

information designed to help investors choose investments. Accordingly, misrepresentation claims by disgruntled investors in the securities law context offer useful analogies for the present action.[6] In securities litigation, courts have frequently found that claims constitute non-actionable puffery and opinions as to future events rather than fraudulent or negligent misrepresentation. See, e.g., Lasker v. N.Y.S. Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (optimistic statements regarding future earnings and sales goals were expressions of opinion and constituted "puffery," not guarantees permitting an actionable case of stock fraud); San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996) (cigarette company's estimates of future earnings were predictions of future events, thus supporting the court's decision to grant a motion to dismiss plaintiff-stockholder's securities fraud claims); Hershfang v. Citicorp, 767 F. Supp. 1251, 1256 (S.D.N.Y. 1991) (reported statements by company executives addressing future direction of the business were opinions and not actionable under federal securities law); Waxman v. Envipco Pick Up & Processing Services Inc., 2003 U.S. Dist. LEXIS 19295, at *26, Dkt. No. 02 Civ. 10132 (GEL) (S.D.N.Y. October 23, 2003) (fraud claims in the securities context could not be sustained because they constituted puffery and future event predictions) (attached hereto as Ex. C); Hunter Envtl. Serv., Inc. v. Hunter Envtl Serv., 921 F. Supp. 914, 922-23 (D. Conn. 1996) (company's genuinely optimistic statements to investors regarding the outcome of a state Commission's decision and its assertion

---

6 An analogy to securities cases is all the more appropriate because the Second Circuit has found that the pleading requirements for the fraud provision of the Private Securities Litigation Reform Act, 15 U.S.C. 78u-4(b)(2), "are essentially a codification of the Second Circuit's interpretation of what is required by Rule 9(b) [for misrepresentation cases]." Novak v. Kasaks, 216 F.3d 300, 309-10 (2d Cir. 2000).

15

that its experts were "the best" were unactionable opinion and puffery, respectively) (Squatrito,

J.); Leventhal v.Tow, 48 F. Supp. 2d 104, 114 (D. Conn. 1999) (company's positive statements

about its value and expansion constituted puffery) (Squatrito, J.)

     Cases considering whether investment advice from stockbrokers to investors similarly

provide an apt analogy to the Corporate Defendants' sports information and handicapping

enterprise.  In Zerman v. Ball, 735 F.2d 15 (2d Cir. 1984), the Second Circuit considered whether

the defendant-brokerage firm had made false representations warranting the plaintiff-investor's

§10b action when the brokerage firm stated in its advertisements that "When E.F. Hutton Talks,

People Listen" and told the plaintiff that bonds were a "marvelous" investment.  Id. at 20.  In

holding that such claims were "simply not actionable" the court relied on a series of cases

permitting "puffery" in the sale of securities.  Id. at 21 (citing Darvin v. Bache Halsey Stuart

Shields, Inc., 479 F. Supp. 460, 462-64 (S.D.N.Y. 1979) (plaintiff would be "crazy" not to sell

his stock); Rotstein v. Reynolds & Co., 359 F. Supp. 109, 113 (N.D. Ill. 1973) (the stock was

"red hot" and plaintiff "could not lose" by investing in it); Bowman v. Hartig, 334 F. Supp. 1323,

1328 (S.D.N.Y. 1971) ("That plaintiffs were told they would make substantial profits without

extraordinary speculative risk is the common plaint of any loser against his investment advisor.

The law does not give premiums for naiveté.") (internal quotations omitted)).  A central theme

running through many of these and similar cases is the requirement that the investor-plaintiff be

judged against the standard of the "reasonable investor."  See, e.g., Newman v. Rothschild, 651

F. Supp. 160, 163 (S.D.N.Y. 1986) ("the reasonable investor is presumed to understand that

[these kinds of statements] are nothing more than 'the common puff of a salesman . . .'") (citing

Bowman v. Hartig, 334 F. Supp. at 1328).  Just as the reasonable investor is in a position to recognize an investment "sales pitch," an experienced gambler such as Valentine is capable of identifying mere "puffery" and responding to it appropriately.

The court's decision in Waxman similarly relies on the "reasonable investor" standard. In Waxman, the defendants purchased the plaintiff's recycling company and then hired the plaintiff to operate it under the terms of a written employment agreement, supplemented by alleged oral promises.  Waxman, 2003 U.S. Dist. LEXIS 19295, at *4.  The defendants also gave the plaintiff an interest in the business in the form of a certain number of depository receipts.  Id. The plaintiff alleged that the defendants represented that "there was no reasonable possibility that [his] investment would result in any financial losses, and that the only reasonable possibility was that [he] would realize profits amounting to many times his investment."  Id. at *26.  The court found that these claims constituted "inactionable 'puffery,' which 'cannot have misled a reasonable investor.'"  Id. (citing cases).  The court favorably cited the Second Circuit's decision in Lasker, 85 F.3d at 59, pointing out that fraud claims relating to similar "general optimistic projections about the financial health and prospects of the defendant corporation" had to be dismissed "because such statements consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."  Waxman, 2003 U.S. Dist. LEXIS at *26 (also citing San Leandro, 75 F.3d at 811; Raab v. General Physics Corp., 4 F.3d 286, 289-90 (4th Cir. 1993)).

The court in Waxman emphasized that the plaintiff should be compared to the "reasonable investor."  Waxman, 2003 U.S. Dist. LEXIS at *31.  Likewise, plaintiffs asserting

17

claims of negligent misrepresentation must meet a reasonable person standard. <u>See</u> <u>Williams</u> <u>Ford, Inc. v. Hartford Courant Co.</u>, 232 Conn. 559, 579-580 (Conn. 1995) ("Although we conclude that no special relationship is required to state a claim of negligent misrepresentation, the plaintiff must allege and prove that the reliance on the misstatement was justified or reasonable."); <u>see also</u> Restatement (Second) of Torts § 538: Materiality of Misrepresentation § 2 (1977) ("The matter is material if (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question . . .").

The <u>Waxman</u> court stressed that the plaintiff "had every opportunity to investigate the actual management practices and financial soundness of the [defendant corporation], or at least to make inquiries that would elicit more specific representations about particular matters." <u>Waxman</u> at *27. The plaintiff also asserted that the corporation was not run in accordance with adequate procedures, counter to the assurances of the defendants. <u>Id.</u> However, the court found that such a claim "exemplifies the rationale for disallowing securities fraud claims based on 'puffery' . . . . No reasonable investor relies on a corporation's representation that, . . . it is operated on a sound and proper basis." <u>Id.</u> at * 31 (internal quotations omitted).

No reasonable investor could believe that Defendants or anyone else has a crystal ball allowing them to unerringly divine the outcome of future sporting event. Valentine, as an experienced gambler well-acquainted with the risky nature of sports betting, was even better situated than the average person to recognize that the purported claims of the Corporate Defendants were mere puffery and future predictions. Indeed, his initial interaction with the Corporate Defendants yielded a loss. (Depo. Tr. at 30.) He knew that the statements of the

18

Corporate Defendants were nothing but the prediction of inherently uncertain future events (id. at

131) and that none of the Corporate Defendants actually knew who would win a given sporting

event.[7] (Id. at 49.) Valentine certainly had the experience and background to identify the

Corporate Defendants' statements as puffery and opinions of future events that could not be

realistically relied upon.[8] Accordingly, summary judgment is warranted.

V.    Valentine's CUTPA Claim is Without Merit

In Count One of the Complaint, Valentine alleges that Defendants' conduct violated

CUTPA. However, Valentine's CUTPA claim lacks merit because he has not met any of the

three criteria for establishing unfairness under CUTPA's "cigarette rule," and because a simple

breach of contract does not constitute a CUTPA violation.

In determining whether a practice is unfair under CUTPA, the Connecticut Supreme

Court has adopted the following criteria from the "cigarette rule" promulgated by the Federal

Trade Commission:

(1) [W]hether the practice, without necessarily having been previously considered
unlawful, offends public policy as it has been established by statutes, the common law, or

---

7 In fact, other sports handicapping services engage in similar puffery (Landmon Dec. ¶ 19 and Ex. Q), and
Valentine himself admits as much. (Depo. Tr. at 141-44.)

8 Indeed, when asked about his purchases of certain shares of corporate stock, the following colloquy occurred at
Valentine's deposition:

| | |
|---|---|
| Q | Did you seek any advice from your broker? |
| A | No, I don't seek advice from my broker. |
| Q | Why not? |
| A | Because they wouldn't be brokers if they were any good. |
| Q | Why, is it somewhat risky to invest in stock? |
| | Mr. Goldstein:    Objection. |
| A | There is a level of risk. |
| Q | Any you don't trust brokers to give you advice? |
| A | That's correct. |

(Depo. Tr. at 67.)

19

otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers.

A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 215, 579 A.2d 69 (1990) (citing cases) (brackets in original). Valentine has failed to meet all three criteria.

A.    Valentine Points to No Public Policy that Defendants Violated

Valentine has failed to meet the first prong of the cigarette rule because the only alleged public policy he has identified is impossibly generalized and does not reference any common law, statutory or other established concept of unfairness. The only alleged public policy conjured up by Valentine is that Defendants' "advertisements and web sites offend public policy for gambling to be conducted in a reasonable and responsible manner." (Complaint ¶ 37.) This wholly ad hoc statement of "policy" fails to meet the first prong of the cigarette rule.

In some sense, it is public policy that *all* activities be conducted in a "reasonable and responsible manner." If statements as general as the one Valentine relies on were sufficient under CUTPA, the public policy prong of the cigarette rule would be superfluous. See City of Bridgeport v. Aerialscope, Inc., 122 F. Supp. 2d 275, 278 (D. Conn. 2000) (finding that the complaint did not meet the public policy prong when "Plaintiff simply asserts that the delivery of an inoperable fire truck is tantamount to a breach of public policy because the citizens of Bridgeport and the firefighters of Bridgeport were unprotected by the allegedly faulty truck."). In sharp contrast, the Connecticut Supreme Court found that the actions of a mortgage lender *did* offend public policy when it "violated two different statutes, each implementing different public policies and effectuating those policies through different legislative means." Cheshire Mortg.

20

Serv. v. Montes, 223 Conn. 80, 107 (1992).

Failing to point to any specific common law, statutory or other established concept of fairness, Valentine cannot meet the first prong of the cigarette rule by relying on the hopelessly general statement of public policy alleged in the Complaint.  Indeed, Connecticut has no generalized public policy against gambling.  Mashantucket Pequot Tribe v. Connecticut, 913 F.2d 1024, 1031 (2d Cir. 1990).  Moreover, even if there was such a public policy, Valentine has failed to articulate in what manner Defendants' activities, which concern the provision of sports picks and other information rather than gambling, are claimed to violate such policy.  Therefore, Valentine's CUTPA claim is without merit.

        B.      Defendants' Conduct is Not Immoral, Unethical, Oppressive or Unscrupulous

Valentine cannot meet the second prong of the cigarette rule because the Corporate Defendants' conduct is not immoral, unethical, oppressive or unscrupulous.  Although this second prong of the cigarette rule is somewhat vague, courts have established certain parameters that Valentine cannot meet.

To begin with, negligent misrepresentation cannot constitute an immoral, unethical, oppressive or unscrupulous practice.  Williams Ford, Inc., v. Hartford Courant Co., 232 Conn. 559, 592-93 (1995).  Thus, to the extent Valentine relies on any alleged negligent misrepresentation on the part of the Corporate Defendants, as alleged in Count Three of the Complaint, such actions clearly do not support a CUTPA violation under the second prong of the cigarette rule.

Moreover, the court in Minally v. Arrow Home Inspections, 2002 Conn. Super. LEXIS

21

3670, at *8-10, Dkt. No. CV020345083S (Conn. Super. Ct. Nov. 19, 2002) (attached hereto as

Ex. D), attempted to delineate a more comprehensive definition of the second prong to the

cigarette rule, looking to common dictionary definitions. The court noted the following:

> Webster's defines 'unethical' as 'not conforming to approved standards of behavior, a socially accepted code, or professionally endorsed principles and practices.' 'Unethical' is also defined as 'not in conformity with moral norms or standards of professional conduct."

Id. (citations omitted).

Applying the definitions applied in Minally, the actions of the Corporate Defendants fall

short of meeting the second prong of the cigarette rule. As discussed above, the statements made

by representatives of the Corporate Defendants were no more than mere puffery made during

various sales pitches regarding inherently uncertain future events. Courts have routinely found

that such statements are commonly made and cannot form the basis of a misrepresentation claim

for the very reason of their ubiquity. See, e.g., Lasker, 85 F.3d at 59; San Leandro, 75 F.3d at

811; Hershfang, 767 F. Supp. at 1256; Waxman, 2003 U.S. Dist. LEXIS 19295, at *26. In fact,

Valentine himself admits that advertisements from other sports handicapping services similarly

make statements regarding how successful their advice will be. (Depo. Tr. at 141-44; see also

Landmon Dec. ¶ 19 and Ex. Q.) Thus, far from being outside moral norms, the statements

allegedly made by the Corporate Defendants are utterly commonplace in the context of sales

transactions in general and sports information services in particular. Thus, the second prong of

the cigarette rule is not met.

22

C.    Valentine Does Not Meet the Third Prong because
      He Could Have Reasonably Avoided Any Alleged Injury

Finally, Valentine cannot meet the third prong of the cigarette rule because, as the

ultimate author of his own misfortune, he could have readily avoided any alleged injury.  The

third prong of the cigarette rule – the "substantial injury" test – is itself subject to a three part

test:

> The independent nature of the consumer injury criterion does not mean that every
> consumer injury is legally 'unfair,' however.  To justify a finding of unfairness the injury
> must satisfy three tests.  [1] It must be substantial;  [2] it must not be outweighed by any
>
> countervailing benefits to consumers or competition that the practice produces;  and [3] it
> must be an injury that consumers themselves could not reasonably have avoided.

Web Press Services Corp. v. New London Motors, Inc., 205 Conn. 479, 484 (1987) (internal

quotes omitted).  Although it is debatable whether Valentine might be able to meet the first two

factors of the substantial injury test,[9] it cannot be disputed that Valentine has failed to meet the

third prong of the substantial injury test because Valentine himself could reasonably have

avoided these alleged injuries.

Connecticut courts routinely reject CUTPA claims where the plaintiff could have

reasonably avoided injury (i) by refraining from continuing to take affirmative action that was

obviously causing injury or (ii) by using reasonable efforts to evaluate the nature of a transaction

and its inherent risks prior to entering such transaction.  The following are just a handful of

examples:

---

9 When asked in an interrogatory to identify "in detail each measure of damages Valentine intends to pursue in this
action and every basis for each measure," Valentine only responded that a "total of $8,000 was lost among all bets
wagered."  (Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 13.)

23

- Locascio v. Mueller, 2004 Conn. Super. LEXIS 875, at *33-34, Dkt. No. CV030089395S (Conn. Super. Ct. March 30, 2004) (attached hereto as Ex. E). The commercial tenant alleged that the landlord violated CUTPA and damaged her business by failing to maintain the premises as required by the lease. However, at the time of the alleged injury, the tenant was on a month-to-month lease and had the ability to vacate at any time, and hence avoid continuing injury to her business. Id. The court found that, "[i]f the property was so untenable, she could have simply closed up, moved out and avoided any losses." Id. Thus, the court determined that the tenant could not sustain a CUTPA claim because she could have reasonably avoided her injuries by refraining from her continued presence at the leased property.

- Alderman v. SCJ, Inc., 2003 Conn. Super. LEXIS 71, at *4-7, Dkt. No. CV020460404S (Conn. Super. Ct. Jan. 9, 2003) (attached hereto as Ex. F). The plaintiff alleged that he requested a three-year lease term on an automobile, but that the defendant drafted a five-year lease and caused the plaintiff to execute it. Id. The court determined that the plaintiff failed to meet the substantial injury prong of the cigarette rule, in part, because his injuries could have been reasonably avoided if the plaintiff had taken the time to examine the lease agreement and evaluate its terms. Id.

- Farrah v. Acker, 1998 Conn. Super. LEXIS 1612, at *19-20, Dkt. No. CV950555890S (Conn. Super. Ct. May 27, 1998) (attached hereto as Ex. G). Plaintiffs had purchased a house from defendant that contained lead paint. Id. Among other causes of action, Plaintiffs brought a CUTPA claim for the defendant's failure to disclose the presence of lead paint. Id. The court struck the CUTPA claim, in part, because the plaintiffs could have reasonably avoided any damages by examining the property and evaluating the lead paint risk. Id.

See also, A-G Foods, Inc., 216 Conn. at 217 (because the plaintiff had been found 40% contributorily negligent the plaintiff could have reasonably avoided the injury); Williams Ford, 232 Conn. at 592-93 (the plaintiffs failed to establish a violation of CUTPA because the jury had found the plaintiffs 10 percent contributorily negligent).

Here, Valentine could have easily avoided any injury. He was well aware of the inherent risks associated with gambling and the difficulties in predicting the winner of sporting events,

admitting that he typically loses about 60% of the time. (Depo. Tr. at 19-20.) Yet, despite this

awareness, Valentine gambled thousands of dollars on sporting events and decided to purchase

services from the Corporate Defendants on numerous occasions. Even more telling, Valentine

continued to purchase additional services from the Corporate Defendants and gamble away his

winnings even after he began losing significant sums of money. (Id. at 95-97.) Certainly, such

behavior is contradictory to the requirement that damages derived from a CUTPA violation are

not reasonably avoidable. Accordingly, Valentine cannot meet the third prong of the cigarette

rule.

At bottom, Valentine's dispute involves a claim for breach of contract. In fact, Valentine

identified at his deposition that he was seeking redress for the Corporate Defendants' failure to

provide the "level of service" he had allegedly contracted to receive. (Id. at 82-83.) However,

even if Valentine could establish a breach of contract claim, which he cannot (as discussed more

fully below), such a simple breach of contract does not rise to a CUTPA violation.

"[T]he vast majority of courts in Connecticut [have concluded] that a 'simple contract

breach is not sufficient to establish a violation of CUTPA. . . .'" Boulevard Assocs. v. Sovereign

Hotels, Inc., 72 F3d. 1029, 1038-39 (2d Cir. 1995) (citing cases). "A rule to the contrary . . .

would convert every contract dispute into a CUTPA violation." Id. at 1039. Even an intentional

breach of contract does not rise to a CUTPA violation unless the claimant demonstrates

"substantial aggravating circumstances attending the breach. . . ." Emlee Equip. Leasing Corp. v.

Waterbury Transmission, Inc., 41 Conn. Supp. 575, 580 (1991). Therefore, even if Valentine

25

could establish a breach of contract, such a breach certainly does not constitute a CUTPA violation.

VI.    Defendants Did Not Breach any Contract

"To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties." L & R Realty v. Connecticut Nat'l Bank, 53 Conn. App. 524, 534 (1999) (emphasis added); see also Coady v. Martin, 65 Conn. App. 758, 766 (2001) ("Numerous Connecticut cases require definite agreement on the essential terms of an enforceable agreement."). Alleged agreements whose terms are not definite and certain are unenforceable. Id.; see also Brookhaven Housing Coalition v. Solomon, 583 F.2d 584, 593 (2d Cir. 1978) ("[i]f essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result"); Hipsky v. Allstate Ins. Co., 304 F. Supp. 2d 284, 288 (D. Conn. 2004) (granting summary judgment because a contract could not have been formed because the stated terms were "too vague and uncertain").

Here, Valentine alleges in Count Four of the Complaint that he entered into a series of oral contracts with the Defendants, the terms of which he does not allege. In response to an interrogatory requesting the terms and conditions of any oral agreements, Valentine only vaguely stated that oral agreements were made over the phone that the Corporate Defendants would provide predictions for sporting events with a "high rate of accuracy." (Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 8.) Valentine failed to identify the date of any alleged oral agreements, the individuals he spoke with to form such agreements or any specific terms

26

thereof.

In response to repeated questioning at his deposition, Valentine again provided only vague information regarding such alleged agreements, identifying three individuals employed by the Corporate Defendants with whom he allegedly formed such agreements. (Depo. Tr. at 82.) However, Valentine still did not identify the specific dates such alleged agreements were made, merely stating that oral agreements were made during telephone conversations at "various times through September, October and December." (Id.) The terms of such alleged oral agreements remained indefinite and nebulous. (Id. at 82-83.)

The general and vague statements upon which Valentine bases his breach of contract claim are certainly not definite and certain enough in order to establish the formation of a contract. Coady v. Martin, 65 Conn. App. 758, 766 (2001); L & R Realty, 53 Conn. App. at 534. As discussed more fully above, the statements regarding the predicted accuracy of the picks and the potential financial benefit to Valentine can, at most, be deemed mere puffery; such statements cannot be considered terms of an enforceable contract. Moreover, in contrast to Valentine's unsupported claim of a contractual term by which all of the Corporate Defendant's picks would demonstrate "a high rate of accuracy," there is clear documentation and specific provisions for those instances in which the Corporate Defendants made express guarantees regarding the accuracy of their services (which Valentine acknowledges were honored). (See Landmon Dec. Exs. L to N, NSS 000010 – NSS 000012, NSS 000032 – NSS 000033 and NSS 000038 – NSS 000040; Depo. Tr. at 74-79.) Because Valentine has failed to prove the existence of any definite

27

and enforceable contracts between himself and the Defendants, summary judgment is warranted.[10]

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted.


Dated:  July 6, 2004

Respectfully Submitted,


BY: _____

Mark D. Alexander (ct20645)
E-mail:  mda@avhlaw.com
Chad A. Landmon (ct20932)
E-mail:  cal@avhlaw.com
Erin M. Boggs (ct22989)
E-mail:  emb@avhlaw.com
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT  06103-3702
Telephone:    860-275-8100
Facsimile:     860-275-8101

Attorneys for Defendants

---

10 Moreover, even if Valentine could establish that a contract was formed for the purchase of sport handicapping services, Valentine freely admits that the Corporate Defendants provided to him all of the services he purchased. (Depo. Tr. at 84-85.)

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing Memorandum of Law in Support of

Defendants' Motion for Summary Judgment has been sent via first-class U.S. mail, postage

prepaid, this 6th day of July, 2004 to:

Jerry D. Goldstein, Esq.
Jerry D. Goldstein, L.L.C.
264 Union Boulevard
Totowa, NJ 07512

_____
Mark D. Alexander

29