UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| N. JAMES VALENTINE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| VS. | : | CIVIL ACTION NO. |
| | : | 3:03CV153 (DJS) |
| NATIONAL SPORTS SERVICES, | : | |
| SMASH MOUTH SPORTS, SCOTT | : | |
| SPREITZER, JIM FEIST SPORTS, JIM | : | |
| FEIST, JOHN DOES 1-5 and XYZ | : | |
| CORPORATIONS 1-5 (such names | : | |
| being fictitious), | : | |
| | : | |
| Defendants. | : | JULY 6, 2004 |

DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT

Pursuant to Local Rule 56(a)(1), defendants National Sports Services, Smash Mouth

Sports, Scott Spreitzer, Jim Feist Sports and Jim Feist (collectively, "Defendants"), hereby

submit the following concise statement of each material fact as to which there is no genuine issue

to be tried relating to Defendants' Motion for Summary Judgment, filed concurrently herewith:

Valentine's Extensive Gambling History

1.      Plaintiff N. James Valentine ("Valentine") has been an active gambler for over 30

years. (Transcript of the Deposition of Nicholas James Valentine (the "Depo. Tr.") at 7, the

relevant pages of which are attached as Exhibit A to the Declaration of Chad A. Landmon (the

"Landmon Dec."), submitted concurrently herewith.)

2.      Over this period (and up to today), Valentine has gambled through poker games,

the lottery, casino games and sports betting through both offshore bookmaking companies and,

currently through a local bookmaker.  (Id. at 7-15.)

  3.  Having gambled on sporting events for more than half of his life, Valentine understands and acknowledges that "gambling on sporting events is risky," that predicting the outcome of a sporting event is difficult and that, of course, it is impossible to know in advance the winner of a sporting event.  (Id. at 19.)

  4.  Valentine's appreciation of the risks of sports gambling has been forged in part through his experience of "usually los[ing]," on roughly 60 percent of his many bets over the years. (Id. at 19-20.)

Valentine Did Not Rely on Any Representations by the Individual Defendants

  5.  Valentine never had any direct conversations of any kind with Jim Feist.  (Id. at 20.)

  6.  Valentine's sole telephone conversation with Scott Spreitzer took place subsequently to all of Valentine's purchases of services from the Corporate Defendants, and concerned Valentine's after-the-fact complaints about his poor gambling performance.  (Id. at 21, 122; see also Landmon Dec. Ex. K, NSS 000053 – NSS 000054.)

Valentine's Purchase of Services from the Corporate Defendants

  7.  After a long history of gambling, Valentine first learned about the services offered by National Sports Services, Smash Mouth Sports and Jim Feist Sports (collectively, the "Corporate Defendants") through an advertisement for Jim Feist Sports in a Pro Football Weekly magazine in September 2000.  (Depo. Tr. at 27.)

2

8.      This advertisement offered to provide a free prediction for a college football game for people who called a toll-free number.  (Id.)

9.      Valentine called this number, and received the free pick from a tape recording. (Id.)

10.     Valentine did not gamble based on the free prediction, which he discovered did not correctly foresee the outcome of the game.  (Id. at 30.)

11.     Valentine purchased a variety of sports advisory services from the Corporate Defendants from September 2000 through December 2, 2000, including picks for college football and basketball, professional football and basketball and professional baseball.  (Landmon Dec. Exs. B and K, Plaintiff's Answer to Interrogatory No. 13, NSS 000053 – NSS 000054.)

12.     Valentine authorized all charges for his purchases from the Corporate Defendants, and does not claim that he was wrongly charged for any services.  (Depo. Tr. at 140-41.)

13.     In making such purchases, Valentine knew that the Corporate Defendants did not – and could not have – actually know who would win the sporting events for which they provided picks, and that the representatives from the Corporate Defendants merely made predictions regarding how well the picks might do in the future.  (Id. at 49, 131.)

Express Guarantees were  Honored by the Corporate Defendants

14.     On certain occasions, the Corporate Defendants made express guarantees to Valentine relating to his purchases.  For example, on September 25, 2000, Valentine made a purchase for $2,060 from Smash Mouth Sports.  (Landmon Dec. Ex. L, NSS 000010 – NSS 000012.)  This purchase had a balance due of $2,160.  (Id.)  However, under an express

guarantee, Valentine was only required to pay the balance if he was up by $9,720 by November 15, 2000. (Id.) Because Valentine was up by roughly $14,000 to $20,000 by November 15, the guarantee was met, and he paid the $2,160 balance. (Depo. Tr. at 74-76.)

15.    On October 21, 2000, Valentine made a purchase of $4,500 from Jim Feist Sports. (Landmon Dec. Ex. M, NSS 000032 – NSS 000033.) This purchase had a balance due of $4,500. (Id.) However, under an express guarantee, Valentine was only required to pay the balance if he was up by ten times his investment, or $45,000, by November 30, 2000. (Id.) Because Valentine was not up by $45,000 by November 30, the guarantee was honored, and Valentine did not pay the $4,500 balance. (Depo. Tr. at 76-78.)

16.    On October 25, 2000, Valentine made a purchase of $10,342 from Jim Fest Sports. (Landmon Dec. Ex. N, NSS 000038 – NSS 000040.) This purchase had a balance due of $18,532. (Id.) However, under an express guarantee, Valentine was only required to pay the balance if he was up by $72,185 by January 31, 2001. (Id.) Because Valentine was not up by $72,185 by January 31, the guarantee was honored, and Valentine did not pay the $18,532 balance. (Depo. Tr. at 78-79.)

Valentine's Gambling based upon Advice from the Corporate Defendants

17.    Valentine cannot recall any specific sporting events that he bet on using picks from Defendants, but claims that he relied on such picks in all of his sports-related bets from about September 21, 2000 to January 27, 2001, which he placed with offshore bookmaking companies using accounts he established for this purpose. (Id. at 38-39, 68-69; Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 10.)

4

18.     Valentine initially made over $24,000 in one of his offshore accounts in the first eight weeks of gambling using the Corporate Defendants' picks, but ultimately lost the majority of the $8,000 that he had deposited into the offshore accounts. (Depo. Tr. at 95-96; Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 10.)

19.     Valentine continued to purchase additional services from the Corporate Defendants and gamble away his winnings even after he began losing significant sums of money. (Depo. Tr. at 95-97.)

<u>Valentine Executes Covenant not to Sue</u>

20.     After Valentine's gambling luck had taken a turn for the worse, he voiced his concerns with the Corporate Defendants regarding the quality of their sports predictions. (<u>Id.</u> at 98-99.)

21.     Valentine directed his complaints to Tom Marguglio, a Sales Manager for National Sports Services. (<u>Id.</u>)

22.     After Marguglio and Valentine discussed Valentine's situation, Valentine executed a December 12, 2000 agreement with the Corporate Defendants pursuant to which, in exchange for a refund of $5,000, Valentine stipulated the following:

> I hereby authorize all charges made to Jim Feist Sports prior to December 12, 2000. . . . I <u>agree to take no further action</u> on any charges I may have incurred on [various credit cards] with Jim Feist Sports prior to this date, December 12, 2000.

(Landmon Dec. Ex. O, NSS 000002.) (Emphasis added.)

23.     After agreeing to this, Valentine received the $5,000 refund from the Corporate Defendants. (Depo. Tr. at 100-01.)

24.     Although Valentine did not purchase any additional services after settling his dispute with the Corporate Defendants, Valentine continued to gamble based on picks included in his previous purchases until January 27, 2001.  (Landmon Dec. Ex. B, Plaintiff's Answer to Interrogatory No. 10.)

Dated:  July 6, 2004

Respectfully Submitted,

BY: _____

Mark D. Alexander (ct20645)
E-mail:  mda@avhlaw.com
Chad A. Landmon (ct20932)
E-mail:  cal@avhlaw.com
Erin M. Boggs (ct22989)
E-mail:  emb@avhlaw.com
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT  06103-3702
Telephone:     860-275-8100
Facsimile:     860-275-8101

Attorneys for Defendants

<u>CERTIFICATE OF SERVICE</u>

THIS IS TO CERTIFY that a copy of the foregoing Local Rule 56(a)(1) Statement has

been sent via first-class U.S. mail, postage prepaid, this 6th day of June, 2004 to:

Jerry D. Goldstein, Esq.
Jerry D. Goldstein, L.L.C.
264 Union Boulevard
Totowa, NJ 07512

Mark D. Alexander

8