Jerry D. Goldstein, LLC
Jerry D. Goldstein (ct17834)
264 Union Boulevard
Totowa, New Jersey 07512
(973) 595-5727

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| N. JAMES VALENTINE <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL SPORTS SERVICES; SMASHMOUTH SPORTS; SCOTT SPREITZER; JIM FEIST SPORTS ; JIM FEIST; JOHN DOES 1-5 and XYZ CORPORATIONS 1-5 (such names being fictitious) <br><br> Defendants. | CIVIL ACTION NO. <br> 3:03CV153 (DJS) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………4

INTRODUCTION ………………………………………………………….....6

PROCEDURAL HISTORY………………………………………………………..8

STATEMENT OF FACTS………………………………………………………9

LEGAL ARGUMENT…..…………………………………………………….14

POINT I:  THE STANDARD FOR SUMMARY JUDGMENT HAS NOT BEEN
SATISFIED BY DEFENDANT AND HENCE, MUST BE DENIED ………………14

POINT II:     THIS COURT SHOULD DENY DEFENDANTS' SUMMARY
JUDGMENT MOTION AND SHOULD RULE IN FAVOR OF THE PLAINTIFF
BECAUSE DEFENDANTS FAILED TO PAY PLAINTIFF THE AGREED AMOUNT,
AFTER ACCEPTING PLAINTIFF'S OFFER TO
SETTLE………………………………………………………...……………17

POINT III:     THIS COURT SHOULD DENY DEFENDANTS' SUMMARY
JUDGMENT MOTION BECAUSE THE DEFENDANTS KNOWINGLY, AND
FRAUDULENTLY OR NEGLIGENTLY MISREPRESENTED THEIR SERVICES
AND INDUCED THE PLAINTIFF TO PURCHASE THOSE SERVICES, INCURING
SERVERE LOSSES…………………………………………………….……………20

      a. Defendants' false representations, whether on the telephone or in
         advertisements, were made as statements of facts because they represented
         themselves as commercial enterprise of handicappers whose extensive
         expertise and analysis procured favorable gambling
         outcomes……………………………………………………..21

      b. Defendants knowingly misrepresented to Plaintiff the winning potential of
         their handicapping services because their advertisements and telephone
         pitches promised a typical customer that "[he] will be the one standing in
         the end," and "[i]t's like cash in hand" and finally, "Free Parlay
         Guaranteed" and "Picks and Analyses, Live Lines & Odds, Up to Date
         Handicapping Stats! And More-
         FREE"…………………………………………………………28

      c. Defendants' known misrepresentations were made to make Plaintiff
         purchase an increasing number of those services, and the Plaintiff did in
         fact purchase those services, suffering a detriment by means of a
         deteriorated financial condition……………………………………….29

POINT IV:    THIS COURT SHOULD DENY DEFENDANTS' SUMMARY
JUDGMENT MOTION BECAUSE DEFENDANTS' ACTIONS AMOUNT TO
UNFAIR TRADE PRACTICES AND VIOLATE CUTPA BECAUSE THE
"CIGARETTE RULE" TEST IS MET……………………………………………….30

    a.  Defendants' practice of using advertising and its telephone representatives
to coerce customers to buy increasingly more of expensive handicapping
services is unfair because of a long standing opposition to such practices
in the law………………………………………………………………32

    b.  Defendants' practices of advertising, calling the Plaintiff at home to solicit
an even higher level of handicapping services with an ease of a telephone
credit card payment, and the nature of the unreliable services represented
as dependable and with a high success rate, amount to immoral, unethical,
oppressive and unscrupulous acts by the Defendants………………34

    c.  Defendants' practices cause substantial injuries to their consumer-Plaintiff
because through advertising and sales calls, the Defendants made this
consumer believe that the handicapping services provided are of high
accuracy, a misleading premise that leads to higher stake gambling and
higher financial losses, as consumers purchase failed predictions in
addition to spending money on the evil of gambling…………………35

CONCLUSION……………………………………………………………………37

## TABLE OF AUTHORITIES

### Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

Bruce v, Home Depot, U.S.A., Inc., 308 F. Supp. 2d 72 (D. Conn. 2004)

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)

Coca-Cola Co. v. Tropicana Products, Inc., 690 F. 2d 312 (2d Cir. 1982)

Cohen v. Koenig, 25 F. 3d 1168 (2d. Cir. 1994)

Conway v. Prestia, 464 A.2d 847 (1983)

D'Amico v. City of New York, 132 F.3d 145 (2d Cir. 1998)

De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 2002 Conn. Super. LEXIS 2862 (Conn. Super. 2002)

Elkind v. Liggett & Myers, Inc., 635 F. 2d 156 (2d Cir. 1980)

Exposition Press, Inc. v. Federal Trade Commn., 295 F. 2d 869 (2d Cir. 1961)

Fichera v. Mine Hill Corp., 541 A. 2d 472 (Conn. 1988)

Fink v. Goldenbock, 680 A. 2d 1243 (1996)

Flaherty v. Schettino, 70 A. 2d 151 (Conn. 1949)

Goldman v. Belden, 754 F. 2d 1059 (2d Cir. 1985)

Hartford Electrical Supply Co. v. Allen-Bradley Co., 736 A. 2d 824 (1999)

Maccomber v. Travelers Property and Casuality Corp., 804 A. 2d 180 (2002)

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)

Murphy v. McNamara, 416 A. 2d 170 (Conn. Super. 1979)

Paiva v. Venech Heights Constr. Co., 159 Conn. 512 (Conn. 1970)

Quasha v. American Natural Beverage Corp., 171 A.D. 2d 537 (1st Dep't. 1991)

<u>Resort Car Rental Systems, Inc. v. Federal Trade Commission</u>, 518 F. 2d 962 (9th Cir. 1975)

<u>San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos</u>., 75 F. 3d 801 (2d Cir. 1996)

<u>Tufano Motorcar v. Equipment & Resources International, Ltd.</u>, 1994 Conn. Super. LEXIS 2285 (Conn. Super 1994)

<u>Sprayfoam, Inc. v. Durant's Renatal Centers, Inc.</u>, 468 A. 2d 951 (Conn. Super. 1983)

<u>Votto v. Am. Car Rental, Inc</u>., 2003. Conn. Super. LEXIS 1941 (Conn Super. 2003)

<u>Web Press Services Corp. v. New London Motors</u>, Inc., 525 A.2d 57 (Conn. 1987)

<u>Zoological and Ecological Research Foundation, Inc. v. Crabtree-Hass Imports, Inc</u>., 1992 Conn. Super, LEXIS 2762 (1999)

### **Statutes**

Connecticut Unfair Trade Practices Act, C.G.S. Sec. 42-110 (2004).

### **Rules**

Fed. R. Civ. P. 56.

### **Other**

37 A.L.R. 2d Fraud and Deceit (2004).

## INTRODUCTION

Defendants National Sports Services, Jim Feist Sports, and Smashmouth Sports located at 3110 Polaris in Las Vegas, Neveda.  John Does 1-5 and XYZ Corporations 1-5 are managers, partners, insiders, co-conspirators and/or associates, or companies doing business in concert or affiliation with the Defendants.  (The above Defendants to be collectively referred to as "Defendants").

The Plaintiff, N. James Valentine ("Plaintiff") is a member of the public and a member of the class protected by the unfair trade practices laws.  Defendant National Sports Services is a profitable business enterprise engaged in the business of selling sports gambling services, including handicapping services.  Handicapping is the process of collecting past performance data and analyzing the relative strengths and weaknesses of matching teams; the results yielded by the analysis are then used in placing wagers on the teams likely to win.  Defendant concedes that no one handicapper can predict all outcomes of games with precision accuracy, but the instant Defendants represented their services and experience as highly accurate.

Defendants advertise together in magazines, on the internet, and in nationally distributed television ads and infomercials.  The ads sometimes include toll free numbers for the members of the public to call and purchase Defendants' services.  The websites include direct links for purchasing Defendants' services, inviting users to "click and win."  (See Exhibit A).   All the internet sites are for all of the Defendants together; for example, if a user accesses www.jimfeist.com, that user will be at the web site of National Sports Services where via direct link he may connect to Scott Spreitzer/ Smash

Mouth Sports.  Id.  Similarly, the print ads may be in the name of any one of the Defendants, but they direct the user to the foregoing Jim Feist web site.

All of Defendants' ads and web sites tout the Defendants as "world champion" handicappers; moreover, they say that purchasing their services would "guarantee" gambling success or constitute "money in the bag."  Before the Plaintiff had the opportunity to realize that the handicapping services amounted to fraud and not to a careful study and analysis of past performance and a reasoned selection of the likely winners, the Defendants obtained in excess of $100,000 of Plaintiff's money paid for those services.  Plaintiff filed his Complaint alleging various causes of action arising from these transactions.  One of Plaintiff's causes of action includes the enforcement of a Settlement Agreement which was reached between Plaintiff and Defendant for the return of $76,000.00.

Defendants curiously mock the Plaintiff, calling him a "lifetime gambler."  No such words and mocking occurred when Plaintiff paid Defendant hefty monies in pursuit of promised betting success.  (See Defendants' brief).  In fact, Defendants unscrupulously preyed and exploited Plaintiff, inducing this victim to lose over $100,000 paid to the Defendants, in addition to his gambling loses.

## PROCEDURAL HISTORY

Plaintiff first filed suit against Defendants in the New Jersey State Court. (Valentine v. National Sports Services, Docket. No. PAS-L-2494-02). The Complaint was dismissed without prejudice on October 3, 2002, for lack of in personam jurisdiction, or in the alternative, under the doctrine of forum non conveniens. (See Landmon Dec. Ex. P.). As the trial court opined, all of the contacts were between Plaintiff, a resident of the State of Connecticut and the Defendant's residents of the State of Nevada. Although New Jersey was the situs of settlement discussion and the Settlement Agreement, the court opined that the contact were too remote to exercise jurisdiction.

Plaintiff initiated this proceeding at the United States District Court, the District of Connecticut, on January 28, 2003. While this Court initially dismissed the original Complaint on April 24, 2003, after filing the First and then the Second Amended Complaints, this Court reversed the dismissal and Court ruled in favor of the Plaintiff on his Motion for Reconsideration of the Rule 12(b)(6) dismissal. Discovery followed, and the Defendants, once again, are attempting to silence Plaintiff by having this Court dismiss the Complaint via this Motion for Summary Judgment, filed on July 6, 2004.

**STATEMENT OF FACTS**

During the four months of the 2000 football season, Defendants deceived Plaintiff into buying over $100,000 in handicapping services that were not based on reasoned analysis or experience. Defendants promised Plaintiff that the more handicapping services he would purchase from them, the more he would win on football wagers; furthermore, the record demonstrates that they "guaranteed" his success. (See Dep. of Valentine, 45: 3-5). Simply speaking, Defendants took advantage of the Plaintiff, an older man and a father of grown children and grandchildren. Defendants made Plaintiff believe that spending increasing amounts of money on the collective experience of the various Defendants through purchases of handicapping services would make Plaintiff's betting success rate increase, and therefore lead to his profit. (See Dep. of Valentine, 46: 17- 47:10).

Plaintiff first contacted the Defendants in September of the year 2000, after spotting an ad in ProFootball Weekly, soliciting a "free pick" via toll free number. (See Exhibit B). Plaintiff called only because the call was free, and did not expect a future relationship with any of the Defendants. On or about September 24, 2000, a representative from Defendant Scott Spreitzer called Plaintiff offering him the entire season of tips on college football games. Defendant Spreitzer's representative then told him that the tips were "money in the bag." Clearly, the Defendants' mischievous scheme prayed on the most inner weaknesses of the Plaintiff, an aging citizen with an uninspiring job at an insurance company. Defendants' game involved the luring of the Plaintiff into getting a "free" pick, and then barraging him with phone calls that nagged him to pay for

handicapping services in the areas of his interest.  (See Dep. of Valentine, 27: 4-13).

Contacting Plaintiff at his home in Connecticut, Defendants asked Plaintiff to pay using

his credit cards, and offered him a season of handicapping services in respect to college

football games.  Furthermore, Defendants induced him to set up an off-shore account to

allow him to gamble, ignoring both Connecticut's and other states' relevant laws. (See

Dep. of Valentine, 69: 1-4).  While the Defendants gave Plaintiff a toll free number for a

company offering off shore gambling services, Plaintiff was told and believed that he was

buying tips from Scott Spreitzer and his organization.  Only when Plaintiff started to

receive credit card statements reflecting the tip purchases, he discovered that the charges

were to National Sports Services, Inc., and not to Scott Spreitzer or to Smash Mouth

Sports.

The more handicapping service that Plaintiff bought, the more telephone

solicitations for increasingly higher and more expensive level of handicapping services

he received.  With each new level of service, the Defendants made new promises of

success, and even guaranteed the Plaintiff's success.  (See Dep. of Valentine, 45: 3-5).

From September 24 throughout October and November, Defendants kept calling the

Plaintiff at home urging him to "upgrade" the level of Defendants' handicapping service.

Id.  Defendants told Plaintiff that the higher the level of service, the more accurate the

predictions become; however, the predictions did not turn out to be any better, and

Plaintiff's bets did not become more successful.  (See Dep. of Valentine, 55:9- 56:9).

They only became more expensive.

Plaintiff truly believed in the predictive abilities of the Defendants and relied

upon their representations as a "guarantee" and "money in the bag".  Receiving frequent

phone calls from the Defendants, the Plaintiff would give his credit card number to any Defendant that called him. All the charges had always appeared as National Sports Services. Moreover, on at least one occasion, when Plaintiff received a follow up call after one of his tip purchases, he was told that the purchase was from "Jim Feist Sports." When Plaintiff had reached the highest tip level for college football tips, someone claiming to be or to represent Jim Feist called him. Defendant Jim Feist sold tips for Professional football that were even more expensive than the college football picks that the Plaintiff purchased earlier.

Plaintiff purchased the tips, this time from Defendant Jim Feist, and for Pro Football. The Plaintiff was advised to place his bets though the same off shore gambling company, and again the charges appeared on his credit card as National Sports Services. During every phone call, Plaintiff was assured that the tips would absolutely lead to winning bets. In fact, Plaintiff was told the picks were so good, that he would be clamoring to buy baseball tips from Defendants in the Spring. From September 24, 2000 through December 2000, the Plaintiff incurred over $100,000 in charges to various credit cards for Defendants' services, in addition to the gambling losses incurred based on what turned out to be Defendants' bad advice. Through all of his dealing with the various Defendants, all charges appeared to National Sports Services, Inc.

Defendants' unscrupulous advertising was a major factor that induced Plaintiff to spend a very sizable amount of money on the Defendants' handicapping services. (See Exhibit C). Plaintiff answered an ad guaranteeing success and a "free" pick. Defendants, each of them, advertise their services in many magazines and periodicals which are distributed nationally. One such periodical is ProFootball Weekly. It is sold in

bookstores throughout the country, including in Connecticut, and are mailed to subscribers throughout the country including Connecticut. Defendants advertise themselves for the obvious purpose of soliciting business from the public throughout the country. The intent is to obtain customers and increase their sales and thus profit from these sales. (See Exhibit C attached for a sample of the periodicals and the advertisements placed in those periodicals).

In each of the advertisements, Defendants represent their services as "absolutely free" and say that that "[the potential customer] will be the one standing in the end." Id. One such advertisement for Defendant Jim Feist states: "It's like cash in hand." Another one of his advertisements states: "Free Parlay Guaranteed" and "Picks and Analyses, Live Lines & Odds, Up to Date Handicapping Stats! And More- FREE". Id.

One of Defendant Feist's full page ads attempting to solicit clients says what he represents: "What to Expect, Free Live Lines & Odds! Free Picks and Analyses! Current & Archived Scores! Up-to-Date Handicapping Stats! Contests, Injury and Weather Reports, **Veteran Advise, Pro Selections &MORE**!!!" Defendant Feist also represents himself to be a "World Champion Handicapper". Id.

Before the Plaintiff's filing of the Complaint, the parties engaged in extensive negotiations in efforts to settle Plaintiff's claims. Numerous telephone calls were made through Plaintiff's counsel and numerous correspondences were sent. In fact, in mid-February of 2001, the Plaintiff's claims were presumably settled and letters were sent confirming the terms of the Settlement to the Defendant. (See Exhibit D).

Thereafter, Defendant drafted a Settlement Agreement, executed it, and forwarded it to the Plaintiff for execution. (See Exhibit E). Clarification was needed as

to the terms of the Settlement form submitted by the Defendant.  Thereafter, additional correspondence and telephone calls were exchanged without success in bringing this matter to final disposition.  (<u>See</u> Exhibit F).  Plaintiff's Complaint herein also seeks alternative relief including one arising from the above Settlement Agreement.

**LEGAL ARGUMENT**

This District Court should deny Defendants' Summary Judgment Motion because the Defendants knowingly misrepresented their handicapping services as much more accurate and results prone, a misrepresentation that induced Plaintiff to purchase Defendants' services and to rely on those representations to his detriment, as he paid Defendants over $100,000 in the course of several months.  Moreover, this Court should rule in favor of the Plaintiff because the parties have already agreed to settle this matter.

**POINT I:  THE STANDARD FOR SUMMARY JUDGMENT HAS NOT BEEN SATISFIED BY DEFENDANT AND HENCE, MUST BE DENIED**

This Court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed.R.Civ.P. 56(c).

The District Court's inquiry must start with determining which facts are material. We are told that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine," i.e., unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id.

Where, as here, the non-moving party would bear the burden of persuasion at trial, the moving party must first make a prima facie case by either identifying the

portions of the record "which it believes demonstrate the absence of a genuine issue of material fact" or "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). After such a prima facie showing, the non-moving party must respond with "specific facts showing that there is a genuine issue for trial." See Fed.R.Civ.P. 56(e). To this end, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998). In other words, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

 Throughout this inquiry, the Court must credit the non-moving party's evidence and draw all justifiable inferences in favor of that party. See Anderson, 477 U.S. at 255. The standard for granting summary judgment under Federal Rule of Civil Procedure 56 are stringent. Because summary relief is such a harsh result, defendants, as the moving parties, are strictly held to the weighty burden of proving the absence of any genuine issue of material fact, and that as the moving parties they are entitled to judgment as a matter of law, F. R. Civ. P. 56(c).

 This Court should deny the Defendants' Summary Judgment Motion because a genuine dispute of material facts exists. While the Defendants simply assert that the Plaintiff has not stated a viable cause of action and that he did not rely on any statements made by any of the individual Defendants, Plaintiff offers foregoing evidence that creates

a dispute in the material facts relating to the Defendants' advertising, phone calls soliciting handicapping services, and of course, whether a reasonable Plaintiff could rely on such representations.  This Court should rule that only the trier of fact can adequately parse through the disputed material facts herein and determine the matter; the instant matter is also one of heightened import in that the Defendants pride themselves and profit from preying on unwitting members of the public, circumventing the law with every new off-shore gambling account they open, and intentionally, or at a minimum negligently, deceive the public with able people's minds, as their smooth-talking representatives barrage the every day men and women with promises of gambling success.  Therefore, this Court should not allow the Defendants to escape liability in such a summarily fashion, as material fact questions remain.

**POINT II:     THIS COURT SHOULD DENY DEFENDANTS' SUMMARY
JUDGMENT MOTION BASED ON DEFENDANT'S AGREEMENT TO PAY
PLAINTIFF TO SETTLE HIS CLAIMS**

This Court should rule in favor of the Plaintiff and deny Defendant's Summary

Judgment Motion because the Defendants agreed to settle Plaintiff's claims, but have

never lived up to the agreement; therefore, a genuine issue of material fact exists

whether the Plaintiff has settled with the Defendants, a matter that only a fact finder can

consider.

Rule 56(e) trial admissible evidence presents a clear dispute of material fact.  In a

letter dated February 19, 2001, Demetrios K. Stratis, Esq., confirmed with Ms. LaTrisa

Young, a Client Service Manager at National Sports Services, Inc. regarding a settlement

agreement meant to avoid costly litigation between the parties.   (See Exhibit D) In the

letter, Mr. Stratis requested that, in addition to any sums already paid, $63,000 be paid to

the Plaintiff.  Id. Furthermore, the letter set up the schedule of payments.  Id.

Also in the letter, in consideration for the payments, Plaintiff would waive all

present and future claims against National Sports Services, Inc. and its agents and

representatives.  Id. The letter concludes with Counsel Stratis explicitly reserving his

claims against the National Sports Services, Inc., in case of a default.  Id.

Consequently, National Sports Services, Inc. confirmed the Agreement as laid out

in Counsel Stratis' letter.  (See Exhibit E).  Sales Manager John Buonaugurio, in a letter

dated February 26, 2001, confirmed the National Sports Services, Inc.'s intent to issue a

credit in the amount of $63,000, broken up in three installments.  Id.  The correspondence

sets forth the payment schedule, including the relevant accounts that the Defendant

National Sports Services, Inc has promised to credit in the letter.   Id.  In consideration for the payments, Plaintiff was to waive all claims, as previously stipulated by Counsel Stratis.  Id.

The foregoing terms of settlement were followed by Defendants' silence, as demonstrated by at least a dozen of unsuccessful attempts by Plaintiff's counsel to get in contact with the Defendants.  See Letters in Exhibit F.

The Defendants' circuitous argument that the agreement dated December 12, 2000 controls and bars further action is selfserving because Defendants would not have entered into further negotiations and agree to pay $63,000 to Plaintiff when, as the Defendants claim,  Plaintiff signed off on all claims against them on December 12, 2000 Agreement in the first place.  Indeed, this line of argument before this Court represents another deceptive tactic, a calculated strategy on part of Defendants who hope that this Court overlooks the glaring contradiction in calling the December agreement as sole and final, yet having entered into another agreement negotiation less than two months later and agreeing to settle for a sum thirteen times larger than the December settlement agreement.  Plaintiff signed the December 12, 2000 agreement understanding that he was waiving right to "complain[] to [his] credit card companies and charge back [his] purchases." (See Dep. of Valentine, July 28, 04, 102: 9-17).  Quite clearly, the Buonaugurio letter confirming the February 2001 settlement agreement, or at the very minimum, the willingness to enter into further agreement much greater in sum than the $5,000 December 2000 agreement, presents an issue where genuinely material facts are in dispute; therefore, because a reasonable fact finder could disagree about which

agreement controls and regarding the finality of the respective agreements, this Court should deny this Summary Judgment motion and rule in favor of the Plaintiff.

**POINT III:     THIS COURT SHOULD DENY DEFENDANTS' SUMMARY JUDGMENT MOTION BECAUSE THE DEFENDANTS KNOWINGLY, AND FRAUDULENTLY, OR AT A MINIMUM, NEGLIGENTLY MISREPRESENTED THEIR SERVICES AND INDUCED THE PLAINTIFF TO PURCHASE THOSE SERVICES, INCURING SERVERE LOSSES.**

This Court should deny Defendants' Summary Judgment Motion and rule in favor of the Plaintiff because the Defendants unscrupulously preyed on Plaintiff by misrepresenting their services by lines such as: "[A]bsolutely free," "[you] will be the one standing in the end," "[i]t's like cash in hand," and finally, "Free Parlay Guaranteed" and "Picks and Analyses, Live Lines & Odds, Up to Date Handicapping Stats! And More- FREE".  (See Exhibit B and C).  This Court should rule in favor of the Plaintiff because based on these known misrepresentations, Defendants induced Plaintiff to pay for their promises and suffered an enormous detriment by incurring a credit card debt in excess of $100,000, not including any gambling losses.

To state a fraudulent representation claim, the Plaintiff must show that:

(1.) [A] false representation was made as a statement of fact; (2.) it was untrue and known to be untrue by the person making it; (3.) it was made to induce action by the other party; and (4.) the other party did so act upon the statement to his or her detriment.

See Bruce v. Home Depot, U.S.A., Inc., 308 F. Supp. 2d 72, 74-75 (D. Conn. 2004)(citations omitted).  Negligent representation is present when "the defendant falsely and recklessly represent[s] [something] to the plaintiffs, for the purpose of inducing action, . . . and that the plaintiffs were induced to rely on these representations, which were the result of a mistake on the part of the defendant but were not innocent.  See Richard v. A. Waldman & Sons, Inc., 232 A.2d 307, 309 (Conn., 1967).  In other words,

the cause of action of negligent misrepresentation lies when: (1) defendant had a duty to use reasonable care in giving information; (2) defendant supplied false information; (3) upon which the plaintiff relied; (4) to its damages. See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 2002 Conn. Super. LEXIS 2862, at 21 (Conn. Super.  2002)(See Exhibit G).  We are also told that even "[a]n innocent misrepresentation may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth. See 23 Am. Jur. 920, Fraud and Deceit, § 127; see also 37 A.L.R.2d Fraud and Deceit, Section 128.  The De La Concha Court also states that "[t]he two essential elements are a duty on the part of the defendant to disclose and reliance on the part of the plaintiff." 2002 Conn. Super. Lexis 2862 at 21.  Furthermore, "the duty to disclose correct information arises from a closer degree of trust and reliance than in the ordinary business relationship." Id.  We are also told that, "a claim for negligent misrepresentation can only stand when there is a special relationship of trust and confidence which creates a duty for one party to impart correct information to another." 37 A.L.R.2d at Section 129.

In Paiva v. Vanech Heights Constr. Co., the Court stated:  "Although the general rule is that a misrepresentation must relate to an existing or past fact, there are exceptions to this rule, one of which is that a promise to do an act in the future, when coupled with a present intent not to fulfill the promise, is a false representation."  159 Conn. 512, 515 (Conn., 1970)(Citing Flaherty v. Schettino, 70 A.2d 151 (Conn. 1949).


**a. Defendants' false representations, whether on the telephone or in advertisements, were made as statements of facts because they represented themselves as commercial enterprise of handicappers whose extensive expertise and analysis procured favorable gambling outcomes.**

In their advertisements and during the course of telephone proposals, Defendants' statements were made as statements of facts because the Defendants represented their commercial enterprise as selling handicapping research drastically improved betting odds. This Court should reject the Defendants' claim that their advertisements amount to puffery because Defendants' statements were specific, completely not qualified, and a reasonable buyer of these handicapping services would rely on the representations.

In Paiva v. Vanech Heights Constr. Co., the Court found fraudulent misrepresentation because "'[the defendants made] promises and representations to the plaintiffs knowing them to be false which induced the plaintiffs to buy their homes'" from the defendants when the home buyers were made to believe that no apartment houses would be build in their development. 159 Conn. at 517. That Court tells us that "[t]he jury could reasonably have found that the defendants represented to the plaintiffs, before they signed contracts to purchase their homes, that only one-family homes would be built on the lots in the subdivision" where "several plaintiffs were shown a written list of restrictive covenants, including one which specified that each subdivision lot was restricted to a one-family dwelling unit" and where "an advertising pamphlet of the defendants described one-family homes and made no mention of apartment houses" and where "a sign on one of the subdivision lots advertised only homes" and finally, where "a map in the defendants' sales office showed only one-family homes on the subdivision lots." Id. Based on this evidence, the Paiva Court tells us that "the jury could also reasonably have found that the defendants knew that the aforementioned representations were false" because a reasonable inference from evidence could be drawn that:

> the defendants had conceived the idea of building apartment houses on some of
> the lots in the subdivision well before the plaintiffs entered into contracts with the
> defendants for the purchase of homes, and that, once the defendants decided to
> build apartment houses, they kept their intention to do so from the plaintiffs
> because they anticipated that the existence of such buildings would adversely
> affect the sales of one-family homes. And the jury could reasonably have found
> that the defendants' representations induced the plaintiffs to buy homes from the
> defendants.

Id. Further, the Court states that the plaintiffs would not have entered into contracts to

purchase homes from the defendants if they had known that they would be neighbored by

apartment houses." Id.

The Court in Cohen v. Koenig, states that "statements will not form the basis of a

fraud claim when they are mere "puffery" or are opinions as to future events." 25 F.3d

1168, 1172 (2d Cir., 1994)(citing Quasha v. American Natural Beverage Corp., 171

A.D.2d 537, 537, (1st Dep't 1991)). The Cohen Court goes on to say that "[n]onetheless,

a relatively concrete representation as to a company's future performance, if made at a

time when the speaker knows that the represented level of performance cannot be

achieved, may ground a claim of fraud." Id.

The Court gives us several examples: In Goldman v. Belden, the Court reversing

the dismissal of a complaint for fraudulent misrepresentation when the Defendants made

a series of very positive and unqualified predictions as to success of a service despite

knowledge that the predictions were based in reliance on another company's fate, and of

company's flaws. 754 F.2d 1059, 1068 (2d Cir. 1985). Further, the Court reasoned that

the Defendants' knowledge of the industry and of the product must have caused them to

have some reservations about the ability of the Company to fulfill the predictions. Id. at

1068-69. While acknowledging that not all predictions are actionable and that liability

probably should not be imposed on the basis of words that "bespeak caution," the Court

tells us that there was not a note of caution in the defendants' statements and that the defendants knew caution was warranted. Id. See also Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 164 (2d Cir. 1980) (stating that "liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year"); Web Press Services Corp. v. New London Motors, Inc., 525 A.2d 57, 62-63 (Conn. 1987)(saying that another factor to be considered in determining whether a statement creates an express warranty is whether it was written or oral, the latter being more likely to be considered puffing).  This Court should consider the written advertisements and solicitations to be more than puffery and that the trier of fact may deduce from the testimony at trial that the Defendant's fostered a mistaken belief concerning a material fact subjecting them to liability.

Similarly to Paiva, where court ruled in favor of the plaintiff home buyers after the finding fraudulent misrepresentation, this Court should also rule in favor of the Plaintiff because the instant Defendants also made 'promises and representations to the [Plaintiff] knowing them to be false which induced the [Plaintiff] to" pay the Defendants for their picks just like the Paiva plaintiffs were induced to "buy their homes, believing that no apartment houses would be build in their development."  Id.  Furthermore, just as the Paiva defendant's representations were false "because a reasonable inference from evidence could be drawn that the defendants had conceived the idea of building apartment houses on some of the lots in the subdivision well before the plaintiffs entered into contracts with the defendants for the purchase of homes, and that, once the defendants decided to build apartment houses, they kept their intention to do so from the

plaintiffs because they anticipated that the existence of such buildings would adversely affect the sales of one-family homes", an inference can be drawn from the instant Defendants' representations of their own services as more than puffery and mere opinions in their Memorandum of Law in support of this motion.

Also, just like in <u>Paiva</u>, the Defendants could not reveal their true intention of selling picks that constituted puffery and opinions, and therefore committed fraudulent misrepresentation. Finally, like the <u>Paiva</u> defendants' advertising lead the plaintiffs to believe that the subdivision would contain only houses, the instant Defendants' advertising promising customers that "[you] will be the one standing in the end," and "[i]t's like cash in hand" and finally, "Free Parlay Guaranteed" and "Picks and Analyses, Live Lines & Odds, Up to Date Handicapping Stats! And More- FREE", also had the same effect, making the Plaintiff rely on those representations to his detriment. (<u>See</u> Exhibits B and C). Therefore, just as the Paiva Court found fraudulent misrepresentation, this Court should also find that a genuine dispute of material fact exists, and therefore, the District Court should deny the Defendants' Summary Judgment Motion, and should rule in favor of the Plaintiff permitting this matter to proceed to trial.

Like the unqualified and incautious <u>Goldman</u> predictions regarding the future performance of the company, the instant Defendants' advertisements made no mention of anything else but of free Picks and analysis, calling them "cash at hand" and promising its customers Free Parlay Guaranteed; in fact, the Defendants now call the predictions, passed off as "sure things" in the advertisements, as nothing but mere puffery. Such argument flies in the face of the ordinary meaning of the language used by the Defendant's in those representations. <u>See</u> Defendants' Brief. Words such as "guarantee"

and "free" and phrases such as "cash in hand" and "one left standing" are not words of puffery but of specific performance.

Nevertheless, just like the <u>Goldman</u> Court tells us that those defendants knew that their predictions warranted caution, the instant Defendants also knew that their predictions should have been accompanied with a note of caution. Indeed, contacting Plaintiff on the telephone, Defendants, who claimed to have had extensive knowledge of the industry, manipulated him to spend an increasing amount on their services by completely avoiding any words of caution. The instant Defendants' intentionally fostered mistaken beliefs concerning material facts of the services they provided, by representing their predictions, both in the advertisements and during the course of telephone conversations, similar to <u>Elkind</u>'s defendants' knowingly inaccurate progress evaluations of the company.

Courts determine whether statements indicate an express warranty or simply state an opinion or engage in puffery are: (1.) Specificity of the statement; (2.) the extent to which the statements are qualified; and finally, (3.) the reasonableness of buyer's reliance. <u>See</u> <u>Tufano Motorcar v. Equipment & Resources International, Ltd.</u>, 1994 Conn. Super. LEXIS 2285, 3 Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 446810 (September 12, 1994)(finding no express warrantees in plaintiff's purchase of an allegedly inadequate automobile painting booth from the defendants, where the sales agreement explicitly stated that "[n]o warranties, express or implies (sic) and no representations, promises or statements have been made in reference to said property by CTC to PURCHASER UNLESS EXPRESSLY SET FORTH HEREIN"). Moreover, the <u>Tufano Motorcar</u> case tells us that "[w]here a representation is

subject to varying interpretations depending upon varying standards different persons use, classic puffery is involved . . . [t]herefore, the use of phrases such as 'superior quality' 'reduces manpower costs and increases production,' and 'maximizes profits . . . because it will provide a quality service and product at a minimum labor cost' are all classic puffing in the court's view." (Citation omitted.) <u>Id.</u>  Also, because statements such as "Nationwide is on your side" and "fast, fair and friendly service" were nonspecific, the Court rejected that plaintiff's reliance on those statements.

The instant Plaintiff, however, never signed any agreement for services, but instead purchased Defendants' services over the telephone, and only after a representative made promises of high quality handicapping services.  No qualifying remarks were made and obviously, none were provided in writing.  Indeed, on one occasion, Defendants' representative "Ken" had induced Plaintiff to buy handicapping services that were beyond his means by telling Plaintiff that he was right to spend the money as Plaintiff would have over $100,000 dollars in his account by the next year, all by virtue of the tips the Defendants would give.  Defendant's preyed on Plaintiff and knew that they could persuade, through actionable comments, that he would have a significant sum of money in his account in one years time.  The Plaintiff therefore purchased more of the handicapping services that "Ken" described as so "accurate".

Defendants thus represented the results of their handicapping services as very accurate and bound to yield impressive gambling returns.  A reasonable person could very well believe these specific statements by the Defendants represented results from careful study of past performance and from professional analysis as well as inside knowledge, therefore representing actual facts and not mere puffery.  Clearly, Defendants

had methods that were represented to predict a winning trend.  Calling Jim Feist a "World

Champion Handicapper" gave Plaintiff, and would a reasonable person, the belief that his

handicapping services lead to more successful bidding.  At the very least, a reasonable

person would believe that Defendant Feist had a very good record of predicting the

winning teams.  A difference exists between using such empty and nonspecific slogans

such as "Nationwide is on your side" and by advertising a handicapping service ran by

experienced sports men and women who have substantial area experience on the basis of

which they promise good betting results if customers rely on their advise.


**b. Defendants knowingly misrepresented to Plaintiff the winning potential of their handicapping services because their advertisements and telephone pitches promised a typical customer that "[he] will be the one standing in the end," and "[i]t's like cash in hand" and finally, "Free Parlay Guaranteed" and "Picks and Analyses, Live Lines & Odds, Up to Date Handicapping Stats! And More - FREE".**

Defendants knowingly represented, both in advertising and on the telephone, that

Plaintiff would benefit by virtue of purchasing Defendants' handicapping services.

Promising customers that "[you] will be the one standing in the end," and "[i]t's like cash

in hand" and finally, "Free Parlay Guaranteed" and "Picks and Analyses, Live Lines &

Odds, Up to Date Handicapping Stats! And More- FREE" amount to Defendants

knowingly misrepresenting facts to the Plaintiff.

In Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 58 (2d Cir., 1996)

the Court of Appeals rejected stock fraud claims where the defendant spoke of desired

future earnings, sales goals, and of continued prosperity because these statements were

"just the sort of predictive statements of opinion and belief that courts have found

immaterial."  The Court added that "[s]tatements that a company is committed to

increasing earnings, convinced of its business strategy, and has set its most aggressive goals ever are not considered seriously by the marketplace and investors in assessing a potential investment." Id. (citations omitted). See also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir., 1996)(rejecting claims of misleading advertising because the cigarette maker's statement "narrowing [] the price difference between discount and premium brands" simply reflected a policy of the company at that time and were not promises of maintaining that policy in the future). Unlike the unspecific statements in Lasker, expressing belief in the business strategy and goals, the instant Defendants did not make such predictions, but instead told Plaintiff of quality results based on the handicapping experience of the individuals who passed themselves to be experts in the field.

Unlike the San Leandro Emergency Medical Profit Sharing Plan defendant's statement of optimistic expectations and therefore not actionable under the securities laws, the instant Defendants' statements precisely represented the policy of providing handicapping services that would succeed most of the time. The handicapping service obviously did not succeed much because Plaintiff suffered gambling losses, and of course has paid the Defendants over $100,000 for their services. In fact, a one of the Defendants' representatives, Ken, told the Plaintiff that he would be able to pay off over $100,000 in credit card debt the following year if he continued to purchase Defendants' more expensive handicapping services.

**c. Defendants' known misrepresentations were made to make Plaintiff purchase an increasing number of those services, and the Plaintiff did in fact purchase those services, suffering a detriment by means of a deteriorated financial condition.**

Defendants' advertisements and representations of the accuracy of the handicapping services over the telephone became the basis of Plaintiff's conduct. Plaintiff honestly believed that the analytical skills of the self proclaimed "World Champion handicapper" and that the rest of the Defendants' predictive abilities were going to give him a higher success ratio when betting; therefore, he spent large sums of money on Defendants' handicapping services. Indeed, Defendants' advertisements and frequent telephone calls made Plaintiff believe, as he was told, that success was near.

Moreover, Defendant scheme was an elaborate method of persuading him to use their services. At the outset, they solicited him for small bids and after losing relatively smaller sums of money, used those losses as a method to induce him to gamble even more. Knowing that Plaintiff would want to recoup his losses, they solicited him to use their more expensive services, offering greater returns, to recoup the losses and obtain higher gains. Defendants scheme was and is a deliberate and manipulative system specifically designed to give Defendant great profit. Moreover, the instant case involves two parties of unequal sophistication; the Plaintiff is an older gentleman working at an uninspiring job who susceptibility to these "get rich quick" schemes is high.

**POINT IV:    THIS COURT SHOULD DENY DEFENDANTS' SUMMARY JUDGMENT MOTION BECAUSE DEFENDANTS' ACTIONS AMOUNT TO UNFAIR TRADE PRACTICES AND VIOLATE CUTPA BECAUSE THE "CIGARETTE RULE" TEST IS MET.**

Connecticut Unfair Trade Practices Act ("CUTPA") is a remedial statute designed to protect the citizens of Connecticut. See C.G.S. Sec 42-110 a-q (2004). As such, it "**must 'be liberally construed** in favor of those whom the legislature intended to

benefit.'" (emphasis added.) See Fink v. Goldenbock, 680 A. 2d 1243 (1996)(citations omitted). The statute serves to provide a remedy where common law and statutory law may leave a gap, but common sense, morality and public policy dictate otherwise. Murphy v. McNamara tells us that "[f]or the purposes of the CUTPA, statements or acts susceptible to a misleading interpretation concerning consumer matters **are to be construed against the merchant advertiser**." (emphasis added) 416 A.2d 170, 173 (Conn. Super. 1979)(citing Resort Car Rental System, Inc. v. Federal Trade Commission, 518 F.2d 962, 964 (9th Cir.). Furthermore, this Court can find that a practice is unfair because of the degree it meets one of the criteria or because to a lesser extent it meets all three. See Zoological and Ecological Research Foundation, Inc. v. Crabtree-Hass Imports, Inc., 1992 Conn. Super. LEXIS 2762, at 5 (1992)(citations omitted)(see Exhibit H). See also Hartford Electric Supply Co. v. Allen-Bradley Co., 736 A.2d 824 (1999)(saying that all three criteria do not need to be satisfied to support a finding of unfairness). Determining whether the Plaintiff makes out a claim under CUTPA, Connecticut courts use the "cigarette rule" as set out by the federal trade commission to determine when a practice is unfair. The relevant criteria are:

> (1.) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise, whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness; (2.) whether it is immoral, unethical, oppressive, or unscrupulous; and (3.) whether it causes substantial injury to consumers.

Conaway v. Prestia, 464 A. 2d 847 (1983). Moreover, no special particularity requirement exists for a CUTPA claim. See Maccomber v. Travelers Property and Casuality Corp., 804 A. 2d 180, 202 (2002). CUTPA violation, therefore, may be

established by showing either an actual deceptive practice or a practice amounting to violation of public policy. <u>Zoological and Ecological Research Foundation, Inc.</u>, 1992 Conn. Super. LEXIS 2762 at 5. This Court should rule in favor of the Plaintiff and deny Defendants' summary judgment motion because the Plaintiff states a valid CUTPA claim.

> **a. Defendants' practice of using advertising and its telephone representatives to coerce customers to buy increasingly more expensive handicapping services is unfair because of a long standing opposition to such practices in the law.**

Defendants' actions were unfair because they lured Plaintiff to contact them by offering a "free" tip through a toll free phone number; furthermore, the initial contact resulted in a barrage of telephone calls offering increasingly expensive handicapping services with promises of higher accuracy and of increasingly bigger pay offs. Defendants simply convinced the Plaintiff that they had access to information and expertise that Plaintiff simply lacked, and that the purchase advice would yield betting success.

Connecticut's Superior Court found that the plaintiffs had stated a sufficient cause of action under CUTPA when the corporate renter of certain equipment charged plaintiff's credit card the disputed amount. <u>See</u> <u>Sprayfoam, Inc. v. Durant's Rental Centers, Inc.</u>, 468 A.2d 951, 952 (Conn. Super. 1983). Clearly, the CUTPA rulings reflect a public policy of protecting consumers from more powerful corporations claiming that a consumer owes them money. <u>Coca-Cola Co. v. Tropicana Products, Inc.</u>, the Court tells us that an orange juice advertising that states "pasteurized juice as it comes from the orange" in violation of a deceptive advertising practices statute, because "pasteurized juice as it comes from the orange" is false because the process of

pasteurization involves heating the juice and kills microorganisms and enzymes. 690 F.2d 312, 316-17 (2d Cir., 1982). This case tells us that deceptive advertising is within the penumbra statutorily established concept of unfairness.  Indeed, where the defendant developers sold land to Plaintiffs and made certain representations in their advertising regarding the completion of that development, the court found them to be in violation of CUTPA.  See  Fichera v. Mine Hill Corp., 541 A.2d 472, 473 (Conn. 1988).

Our public policy of shielding consumers from corporate greed is well established, as shown in the Sprayform, Inc. case.  Similarly to the defendant renter of equipment who charged a disputed amount to the plaintiff's credit card in that case, the instant Defendants had charged the Plaintiff over $100,000 in a matter of months, and all on handicapping services that were clearly against public policy.  Indeed, the instant Plaintiff had to use credit cards to pay for the tip advice he had received, and the Defendants knew that Plaintiff had not the money to spend on the tips, yet continued to aggressively solicit him with promises of paying of his current credit card debt.

The Coca Cola Co., case, where the Court found the defendants to be involved in deceptive advertising practices of a certain orange juice drink tells us that deceptive advertising is not favored in the law; therefore, with the instant Defendants promising a "free" tip only to be followed by a barrage of phone calls requesting hefty sums of money for handicapping services represented as highly accurate, is, too, disfavored in the law, and therefore, the Plaintiff meets the first criteria of the CUTPA claim.  Furthermore, similarly to the Fichera defendants' advertising that was knowingly false, the instant Defendants too, could not produce on what they promised in their advertising and

telephone promises and misrepresentations. Therefore, this Court should find that the instant Defendants' advertising practices are unfair and therefore in violation of CUTPA.

**b. Defendants' practices of advertising, calling the Plaintiff at home to solicit an even higher level of handicapping services with an ease of a telephone credit card payment, and the nature of the unreliable services represented as dependable and with a high success rate, amount to immoral, unethical, oppressive and unscrupulous acts by the Defendants.**

By means of advertising that lured Plaintiff to contact the Defendants, the Defendants pushed him to gamble beyond his means; they also taught him how to evade the gambling laws of the United States. Certainly, pushing Plaintiff to gamble beyond his means and charging him for expensive handicapping services was immoral and oppressive, and telling Plaintiff how to evade state and federal gambling laws is unethical. Defendants' unscrupulous advertising lured Plaintiff by promises of free service, but instead turned out to be a ploy to get Plaintiff's contact information that was used in aggressive soliciting calls by various Defendants.

The Second Circuit's moral and ethical compass remained firm in Exposition Press, Inc. v. Federal Trade Commission, where the court tells us that through CUTPA, "protection must be given to those who do not have the economic sophistication or the awareness possessed by others who may be less concerned about credit; **the act must be applied to protect the unthinking, the unsuspecting and the credulous as well as the sophisticated**." (emphasis added.) 295 F.2d 869, 872 (2d Cir.). Moreover, in Murphy, Plaintiff bought a television set from a renter/seller, after becoming persuaded that good credit was unnecessary and that she could return the set before the 28 weeks had passed, after which she was to pay off the set and become an owner. 416 A.2d at 173 (Conn.

Super. 1979).  Importantly, Plaintiff was not told of the purchase price, which was substantially higher than the retail sales price.  Id.  The Murphy Court found a violation of CUTPA because the bargain was unconscionable, as the retail price of the television set was more than half of the Defendants' price.  Id. at 175.

Just like the immoral practices in Murphy, where the Plaintiff was charged a much higher price than the retail price for a television set she purchased, the instant Plaintiff paid over $100,000 dollars for betting tips from the Defendants, and in the matter of several months.  Clearly, Defendants' promises of substantial returns to the Plaintiff when the Defendants knew that their services were a scam were immoral and unethical.  Just like in Murphy, the high prices the Defendants charged for their services and which the Plaintiff could not afford to pay amount to unconscionable actions that are immoral, unethical, and scrupulous, and therefore a violation of CUTPA.

Moreover, public policy dictates that the actions of the Defendant are violative of CUTPA.  That the Defendant's conduct is immoral, unethical, oppressive, or unscrupulous is obvious, and, at a minimum, it is a genuine issue of material fact to allow this matter to proceed to trial.  As stated earlier, a CUTPA claim is established by showing either an actual deceptive practice **or** a practice amounting to violation of public policy.  Zoological and Ecological Research Foundation, Inc., 1992 Conn. Super. LEXIS 2762 at 5.

**c. Defendants' practices cause substantial injuries to their consumer-Plaintiff because through advertising and sales calls, the Defendants made this consumer believe that the handicapping services provided are of high accuracy, a misleading premise that leads to higher stake gambling and higher financial losses, as consumers purchase failed predictions in addition to spending money on the evil of gambling.**

35

The Defendants' practices caused a substantial injury to the Plaintiff, because the advertisements and the telephone solicitations for game tips caused Plaintiff to lose over $100,000, in the matter of just a few months. Our Supreme Court has found substantial injuries amounting to a CUTPA violation where the defendant car lessor wrongly charged Plaintiff lessee's credit card and could not justify the charge. See Votto v. Am. Car Rental, Inc., 2003 Conn. Super. LEXIS 1941, at 14-15 (Conn. Super. Ct., 2003).

Here, the substantial injury is directly proportionate to the monetary losses incurred by the Plaintiff. But for the actions of the Defendants, none of the losses would have occurred. Defendant's scheme to lure Plaintiff into using his credit card to pay for handicapping services for gambling and incur losses in excess of $100,000 are substantial injuries within the meaning of CUTPA.

**CONCLUSION**

For the foregoing reasons, this Court should deny the Defendants' summary judgment motion.

Dated:   August 1, 2004.

Respectfully Submitted,

BY: /s/ Jerry D. Goldstein
Jerry D. Goldstein, Esq.
Jerry D. Goldstein, L.L.C.
264 Union Boulevard
Totowa, NJ 07512

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that a copy of the foregoing Brief in Opposition to Defendants' Motion for Summary Judgment has been sent via Federal Express, this 13th day of August, 2004 to:

Mark D. Alexander
Chad A. Landmon
Erin M. Boggs
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103-3702