LEXSEE 1994 CONN. SUPER. LEXIS 2285

TUFANO MOTORCAR, INC. v. EQUIPMENT AND RESOURCES INTERNATIONAL LTD., ET AL

NO. CV 91-0446810S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD - NEW BRITAIN, AT NEW BRITAIN

*1994 Conn. Super. LEXIS 2285*

September 12, 1994, Decided

NOTICE: [*1]   THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**LexisNexis(R) Headnotes**

JUDGES: LAVINE

OPINIONBY: DOUGLAS S. LAVINE

**OPINION:**

**MEMORANDUM OF DECISION**

This case relates to a dispute stemming from the purchase of a spray paint booth for automobiles. Plaintiff claims that the spray paint booth was not all it was represented to be. Defendants claim it was. After reviewing the court file, trial notes, exhibits, and submissions of counsel, the court concludes that plaintiff has failed to prove its case against defendants by a preponderance of the evidence and therefore rules for defendants on plaintiff's claim. On the counterclaim, the court rules for defendants, but denies defendants' claim for interest.

Complaint and Counterclaim

The revised complaint in this case is dated July 1, 1992. Simplifying and summarizing, the complaint alleges that plaintiff, Tufano Motorcar, Inc., ("Tufano") was at all pertinent times a corporation doing business in Connecticut. The complaint further alleges that defendants Equipment and Resources International, Ltd. ("ERI"), Certified Technology Corp. ("CTC") [*2] and Termomeccanica F.B. ("TFB") were foreign corporations transacting business in the State of Connecticut. The complaint alleges that ERI, acting through Joseph J. Leahy, made representations as to the capabilities of a Welbilt F.B. 9 Cabin-oven and spray booth ("spray booth") which were not accurate, and that Tufano relied on these representations. The First Count alleges that defendants breached their express warranties as stated in *General Statutes § 42a-2-313*. The Second Count alleges a breach of the implied warranty of merchantability as stated in *General Statutes § 42a-2-314*. The Third Count alleges a violation of the implied warranty of fitness for a particular purpose as set out in *General Statutes § 42a-2-315*. The Fourth Count, alleging breach of contract, was ordered stricken by Judge Goldberg in September, 1992, on the grounds that remedies available under the UCC pre-empted such a claim. The Fifth Count alleged a violation of the Connecticut Unfair Trade Practices Act pursuant to *General Statutes §§ 42-110a* et. seq.

Trial in this case was held in May of this year. The parties have submitted detailed briefs ably outlining their view of the facts proven and the applicable [*3] law.

Findings of Fact

The court will only set out the findings of fact it believes necessary to its ruling. They are as follows.

The plaintiff is in the business of painting and refinishing automobiles. CTC sold the spray-booth pursuant to an October 12, 1988 "Sales Agreement", Exhibit E. Joseph Tufano, president of Tufano, characterized the agreement as the final expression of the parties' agreement relating to the purchase and sale of the

Welbilt spray booth. Paragraph 13 of the agreement stated that "No warranties, express or implies (sic) and no representations, promises or statements have been made in reference to said property by CTC to PURCHASER UNLESS EXPRESSLY SET FORTH HEREIN." Joseph Tufano testified that he read the agreement prior to signing it, and understood the meaning of paragraph 13. The transaction was a commercial transaction for purposes of the applicability of the Uniform Commercial Code.

Prior to deciding to purchase the spray booth, Joseph Tufano had explained to Joseph Leahy a number of his goals in purchasing a new spray booth. First, Mr. Tufano wanted to switch to a down draft booth to eliminate dust and dirt particles, thereby eliminating the [*4] need to wet-sand and buff the final product, which enhances a vehicle's finish by removing imperfections. Second, Mr. Tufano wanted a spray booth that would quicken drying time. And third, Mr. Tufano wanted to reduce the number of man hours associated with the process of painting cars and as a consequence increase the turn-around time in getting vehicles back to the owners.

The spray-booth was delivered and installed in January of 1989, the installation being neither "quick" nor "easy," as promised. It has been continuously used by plaintiff since being accepted. Tufano paid CTC $ 42,500.00 for the purchase of the booth against the purchase price, leaving a balance due of $ 2,500.00. CTC was the sole distributor of the Welbilt spray-booth on the East coast for the manufacturer, TFB, who did not appear at trial. ERI was in the business of selling, installing, and repairing equipment used in the spray painting of automobiles. Leahy, an agent of ERI, operated a business independent of CTC.

Prior to signing the sales agreement, Robert Tufano had observed a Welbilt both in operation at Marsh Motors. Joseph Tufano's decision to purchase a Welbilt spray booth was influenced by Robert Tufano's [*5] opinion, as well as recommendations made to him by persons other than defendants. Prior to signing the agreement with defendants, Joseph Tufano had decided to purchase a "down-draft" booth, such as the Welbilt, to replace the cross draft booth it was then using. The spray booth could be used to paint cars, and then dry them.

The evidence showed that numerous factors and variables, unrelated to the functioning of the spray-booth itself, can cause imperfections to blemish a down-draft spray paint job, including but not limited to dirt or dust within the paint; dust, rust, sludge, or moisture in the air supply lines which power the spray gun; shop dust or dirt on the painters or vehicle being painted; lack of proper cleaning and maintenance of the booth and pipes leading into it; failure to adequately clean and change the numerous filters to run the booth; shop dust or dirt in the room where paints were mixed; quality and type of paint used; improper preparation of the vehicle to be painted; and moisture, imperfection, or contaminants in the paint and paint cans used. The skill and experience of the person overseeing the paint job can also have a significant impact on the quality of [*6] the job produced.

The evidence indicated that a number of these extraneous factors existed, contributing to problems with the paint jobs being done by the spray booth.

Joseph Tufano did not have the Welbilt spray booth inspected to determine if it was operating properly in and of itself, or in comparison with other down-draft booths. Only a "handful" of the estimated 500 cars painted in the booth had received paint jobs of the quality Robert Tufano had expected.

After the Welbilt spray booth was delivered, problems developed. It took longer than promised to install and be made operational. Various agents of defendants worked with plaintiff to solve the problems. Tufano was disappointed because he felt it had been promised that the new booth would completely eliminate the need for any wet-sanding and buffing of finished automobiles. Joseph Leahy returned to plaintiff's place of business to discuss the problems and attempted to resolve them. There were no mechanical or electrical problems with the spray booth.

A Welbilt brochure, Exhibit A, made reference to a "totally controlled environment (dust and moisture free)" and asserted that vehicles painted and dried in the Welbilt spray [*7] booth and oven would come out "factory new." The brochure made other representations about the quality and functioning of the spray booth, including the representation that it was a "space and time saver;" that it produced "O.E.M. (original equipment manufacture) finishes; that it "reduces manpower costs and increases production;" and that it "maximizes profits . . . because it will provide a quality service and product at a minimum labor cost." No where does the brochure promise that the spray booth will completely eliminate the need to wet-sand and buff a vehicle. Plaintiff's witnesses testified that they believed and relied upon these representations. Plaintiff produced no evidence at trial comparing the quality of the finishes Tufano was receiving with "factory new" finishes, as that term is used in the trade. The phrase "dust and moisture free" are terms of art in the trade meaning that an environment will be free of contaminants associated with the normal environment in a body shop. Tufano relied on the brochure, among other things, in reaching its decision to purchase the Welbilt spray booth.

1994 Conn. Super. LEXIS 2285, *

Nor did plaintiff produce evidence at trial indicating that the spray booth at issue [*8] was unfit for the ordinary purposes that down-draft booths are used, that is, to spray paint cars. The evidence indicated that whether or not a car needed to be wet-sanded and buffed, to improve its finish, was a matter of individual choice and personal, subjective preference. Some new car dealers wet-sand and buff cars, or portions of cars, to make them more attractive to customers.

Joseph Leahy denied that he had ever represented to anyone that the Welbilt booth would completely eliminate the need to wet-sand and buff finished autos, or that it could totally eliminate dirt on finished autos. Robert Tufano testified that Leahy had told him that the Welbilt booth would result in less dirt on finished cars than the cross-draft booth then being used by Tufano. However, Robert Tufano conceded that Joseph Leahy had never told him the Welbilt spray booth would completely eliminate dust. Joseph Tufano testified that he felt that he had been assured by Joseph Leahy that the purchase of the Welbilt spray booth would totally eliminate the need for wet-sanding and buffing. Leahy, Tufano said, "pushed his product."

At trial, pursuant to *General Statutes § 42a-2-202*, defendant made [*9] a motion to strike testimony that included statements (warranties) made by defendants on the grounds that the warranties fell outside the purview of the sales agreement. At trial, defendant also made a motion to dismiss pursuant to Practice Book § 302 on the grounds that plaintiff had failed to make out a prima facie case. The motion to dismiss rested mainly on the claim that plaintiff had not proven damages with sufficient certainty. n1

n1 The court denies defendants' motion to strike any alleged warranties, representations, or promises made by defendants' agents, outside the scope of the sales agreement, pursuant to *General Statutes § 42a-2-202*. It is true that Joseph Tufano testified at trial that he understood the sales agreement to be the final expression of the parties' agreement concerning the purchase and sale of the Welbilt spray booth. Paragraph 13 of the sales agreement states that "No warranties, express or implies (sic) and no representations, promises or statements have been made in reference to said property by CTC to PURCHASER UNLESS EXPRESSLY SET FORTH HEREIN." However, whether the parties intend a signed writing to be the repository of their final agreement is a legal question, to be determined by all the conduct and language of the parties and surrounding circumstances. *Damora v. Christ-Janer, 184 Conn. 109, 113-114, 441 A.2d 61; Kelly v. Karam, 6 Conn. Cir. 341, 273 A.2d 294 (1970)*. See also *Acme Pump Co., Inc. v. National Cash Register Co., 32 Conn. Sup. 69, 337 A.2d 672 (1974)*. Notwithstanding Mr. Tufano's testimony, the court is not convinced, having observed him testify, and in light of all the facts and circumstances as developed at trial, that he truly understood the legal significance of the above-cited clause. Moreover, close examination of the sales agreement, Exhibit E, indicates that the agreement itself states neither that it is intended by the parties to be the final nor complete agreement of the parties, notwithstanding the above clause relating to the warranties. While the evidence at trial provides some evidence that the agreement might have been intended to be the final agreement of the parties, it is less clear that it was intended to be the complete agreement between the parties. Where a writing is final but incomplete, it is said to be a partial integration, and while it may not be contradicted by evidence of prior agreements, it may be supplemented by evidence of consistent additional terms. Calamari and Perillo, Contracts (1977), § 3-2, "The Parol Evidence Rule," at page 101.

The court also denies defendants' motion to dismiss pursuant to Practice Book § 302 on the grounds that plaintiff failed to adequately prove damages.

[*10]

Legal Analysis

Express Warranties

*General Statutes § 42a-2-313(1)* provides as follows:

> (1) Express warranties by the seller are created as follows:
> (a) any affirmation of fact or promise by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation of promise.

The burden rests on plaintiff to show both the existence of a warranty and that it was breached. *Stelco Industries v. Cohen, 182 Conn. 561, 563-64, 438 A.2d 759 (1980)*.

In this case, the most glaring difference between the parties is plaintiff's contention that Leahy represented

that no wet-sanding and buffing would be needed if the Welbilt spray booth was purchased, and Leahy's denial that he ever made such a representation. Leahy testified that it was common knowledge at the time in question that the need to wet-sand and buff could not be eliminated by any spray booth, and that it would not have been reasonable for anyone to think so. Having observed Joseph Tufano and Leahy testify, the court finds that they were equally credible, and does not doubt either of their veracity. [*11] The court concludes that as to this particular issue, therefore, a misunderstanding or miscommunication occurred. Consequently, plaintiffs have failed to carry their burden of persuasion. It is worth adding, however, that the evidence in this case makes it clear that defendants could not claim at any time in the future that use of the spray-booth would totally eliminate the need to wet-sand and buff, since such a claim is not capable of being made in good faith.

With respect to other claimed express warranties made by defendants and their agents -- most particularly those contained in Exhibit A, the Welbilt brochure -- the court finds that they either fall into the category of "puffing" or opinion; or that if they did create "express warranties," there was a failure of proof.

For example, the representations in Exhibit A that the booth is a "space time saver," or that it will "maximize profits" are so relative, so subjective, and so elastic that they almost lose their meaning. As noted by defendant, "The Uniform Commercial Code recognizes that some statements of sellers are merely 'puffing' and do not create express warranties. *Vezina v. Nautilus Pools*, 27 Conn. App. 810, 816, [*12] *610 A.2d 1312 (1992)*. Numerous factors relate to whether a seller is merely stating an opinion, or engaging in "puffing," rather than stating an express warranty. White and Summers, Uniform Commercial Code (2d Edition 1980). They include the specificity of the statement, the context, the extent to which they are qualified, and the reasonableness of the buyer's reliance. *Roscher v. Band Box Cleaners, Inc.*, 90 Ohio App. 71, 103 N.E.2d 404 (1951). See also General Statutes § 42a-2-313(2), stating in relevant part that ". . . an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Nonspecific descriptions such as "excellent," "mint condition," or "unusual" are dealer's talk, and do not give rise to warranties. *Web Press Serv. Corp. v. New London Motors*, 203 Conn. 342, 351, 525 A.2d 57 (1987). Where a representation is subject to varying interpretations depending upon varying standards different person use, classic puffery is involved. *Martin Rispens & Son v. Hall Farms, Inc.*, 601 N.E. 2d 429 (Ind. 1992). Therefore, the use of phrases such as "superior quality," [*13] "reduces manpower costs and increases production," and "maximizes profits . . . because it will provide a quality service and product at a minimum labor cost," are all classic puffing in the court's view.

The analysis is somewhat more complex, as defendants concede, with respect to statements that are more subject to a precise meaning, and therefore more capable of being affirmed or refuted. That is the case with respect to a claim of "quality painting," "O.E.M." finish or "factory new finish." The court agrees with plaintiff that an express warranty with respect to future, anticipated performance must be so clearly stated that there is no ambiguity whatever about its meaning. *Connor v. Bogrett*, 596 P.2d 683, 688 (1979). The representation that the spray booth "is able to" duplicate O.E.M. finishes acknowledges that there are various factors -- outside the control of the spray booth's capabilities -- that may affect the quality of the job. Moreover, in this case, as defendants argue, plaintiff produced no expert testimony at trial clearly defining an "O.E.M. finish" or comparing it to the results achieved by the Welbilt spray booth. The same is true with respect to the claim [*14] of 99.9 percent air purity. The proof failed to demonstrate precisely what this meant, and that the spray booth fell short of this standard. With respect to the reference to a "totally controlled environment (dust and moisture free)," the testimony was that this was a reference to the internal environment of the booth. Given the external factors mentioned above, plaintiff's proof was inadequate on this point as well.

The court agrees with defendants that the phrases "factory new" and "dust and moisture free," do not provide any basis for liability. As defendants' expert, Michael Krikorian, testified, "factory new" is a relative term which has a variety of meanings. It depends on a variety of factors unrelated to the performance of the spray booth. In this case, the testimony clearly established that there were numerous factors -- unrelated to the inherent quality and performance of the spray booth -- that could have affected the quality of the jobs. "Dust and moisture free" falls into the same general category. Therefore, even if all of defendants' representations to plaintiff could be characterized as warranties, plaintiff has failed to prove that they were breached.

Implied [*15] Warranties

Where a product has one use and one use only, the implied warranty of fitness for a particular purpose merges with the implied warranty of merchantability. *Schenck v. Pelkey*, 176 Conn. 245, 255, 405 A.2d 665 (1978). See also *McHugh v. Carlton*, 369 F. Supp. 1271 (D.S.C. 1974). In this case, the spray booth has only one use -- the spray painting (and drying) of cars.

Under *General Statutes § 42a-2-314(2)*, a product does not have to attain perfection to pass muster under this section as merchantable. It need only be fit for its "ordinary purpose." To meet this requirement, a comparative analysis of the merchantability of goods must be presented for a plaintiff to meet his proof so that the court can determine if the goods conform to the average quality for the industry. White and Summers, Uniform Commercial Code, § 9-6, "The Implied Warranty of Merchantability," at pages 343-356.

In this case, plaintiff made it clear that it was dissatisfied with the spray booth purchased. But the testimony indicated that while buffing and wet-sanding was required, the spray booth was functioning insofar as it was still being used to paint and dry cars. And plaintiff provided [*16] no testimony by a witness other than the Tufanos against which the court can measure whether the Welbilt booth was not performing in an average manner. The court therefore concludes that plaintiff failed to carry its burden of proof on this point.

Unfair Trade Practices

Based on a review and analysis of the evidence produced at trial, the court finds that plaintiffs have failed to prove by a preponderance of the evidence that defendants engaged in any unfair trade practice proscribed by *General Statutes § 42-110b*. *Web Press Services Corp. v. New London Motors, Inc., 205 Conn. 479, 533 A.2d 1211 (1987); Prishwalko v. Bob Thomas Ford, Inc., 33 Conn. App. 575, 584, 636 A.2d 1383 (1994)*. See also *Vezina v. Nautilus Pools, Inc., 27 Conn. App. 810, 610 A.2d 1312 (1992)*.

Counterclaim

The court finds, upon review and analysis of the evidence produced at trial, that CTC has proven that it is entitled to recovery pursuant to the counterclaim. This amounts to the unpaid portion of the purchase price, presently in escrow, totalling $ 2,500.00. The court therefore orders that judgment be entered against plaintiff on the counterclaim, in favor of CTC.

The court [*17] denies CTC's claim for interest because, considering all the circumstances of the case, while it finds that plaintiff mistakenly withheld payment from defendants, it does not find that the withholding of payment was wrongful under the circumstances. *Campbell v. Rockefeller, 134 Conn. 585, 591, 59 A.2d 524 (1948)*.

Summary and Conclusion

The court's view is that plaintiff has failed to prove by a preponderance of the evidence that any of the warranties made were breached. Therefore, on plaintiff's claim, judgment for defendants may enter; while on the counterclaim, it may enter in favor of CTC as indicated above.

DOUGLAS S. LAVINE

JUDGE, SUPERIOR COURT