LEXSEE 2003 CONN. SUPER. LEXIS 1941

Richard Votto v. American Car Rental, Inc.

CV010456354S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW HAVEN, AT NEW HAVEN

2003 Conn. Super. LEXIS 1941

June 16, 2003, Decided
June 16, 2003, Filed

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**LexisNexis(R) Headnotes**

**JUDGES:** Robert I. Berdon, Judge Trial Referee.

**OPINIONBY:** Robert I. Berdon

**OPINION:** AMENDED MEMORANDUM OF DECISION

This action was brought by the plaintiff Richard Votto to recover damages as a result of unauthorized charges to his credit card by the defendant American Car Rental, Inc. doing business as Acme Rent-A-Car and to recover attorneys fees and punitive damages for violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110b et seq. n1

---

n1 The court bifurcated the issues and on March 6, 2003, rendered a decision with respect to liability and compensatory damages for the "Vehicle Damage Waiver" and liability for Connecticut Unfair Trade Practice Act (CUTPA) [34 Conn. L. Rptr. 245]. The court in this amended decision determines the amount of the attorneys fees and punitive damages for the CUTPA violation.

---

[*2]

On February 20, 2001, the plaintiff rented a truck from the defendant and executed a one-page agreement preprinted on both sides (agreement) which was prepared by the defendant. The front side of the agreement was entitled "Rental Agreement" and had blank spaces to be completed in order to indicate the renter's name, address, type and identification of the vehicle being rented and other such matters.

Also, included on the front page of the agreement was a paragraph entitled "Vehicle Damage Waiver" (waiver). The plaintiff was advised by an employee of the defendant that this waiver provided coverage in order to release him of any responsibility if the truck was damaged as a result of a collision. The preprinted waiver read as follows: n2 "Rates: $ 13.95 per day, $ 97.65 per week. By initializing a box, renter accepts or declines vehicle damage waiver for rates listed above and for damage option below. By accepting waiver, renter accepts full responsibility for all loss/damage to the rented vehicle up to/over (circle one) $ -0- amount per occurrence regardless of cause. Notice: waiver does not cover loss or damage resulting from any violation of paragraphs 1 or 2 of this [*3] agreement, for missing vehicle parts or interior vehicle damage other than normal wear and tear caused by occupants. By declining waiver, customer accepts full responsibility for all loss/damage to rental vehicle." The agreement required the renter to initial his acceptance or rejection of the waiver. The plaintiff accepted and agreed to pay to the defendant $ 13.95 per day for the waiver.

n2 The underscored monetary amounts were completed by the employee of the defendant at the time of the rental.

The plaintiff signed the front of the agreement and above his name there was preprinted the following: "Renter has read both sides of this agreement and agrees to the terms and conditions thereof."

The reverse side of the agreement had approximately 144 lines of print in two columns containing approximately 1775 words printed in type which was a little less than one-sixteenth of an inch. The agreement is very difficult to read. Unlike the waiver there was no requirement that the renter initial any section of the reverse [*4] side of the agreement.

The pertinent part of the agreement on the reverse side as it pertains to the waiver which was included in paragraph 2 was as follows: "The vehicle shall not be used . . . 12) to drive in or though a structure where there is insufficient clearance, whether of height or width," n3 and damage as a result of that use would invalidate the waiver.

n3 The court gives the defendant the benefit of the doubt when it refers to this paragraph. Paragraphs one and two of the section entitled "Prohibited Use" merely provides for the following: "The Vehicle shall not be used: 1) for the transportation of persons for compensation 2) in any race, test, or competitive event."

On February 22, 2001, the day he rented the vehicle, the plaintiff struck a low railroad overpass and damaged the truck. n4 He reported the collision to the police and returned the truck to the defendant assuming the damage was covered by the waiver. The court finds that this belief of the plaintiff was reasonable based on the wording [*5] of the waiver that he initialed and what he was told by the employee of the defendant. The reasonableness of his belief is underscored when the annualized cost of the waiver in the amount of $ 5077.80 ($ 97.65 x 52 weeks) is considered. However a literal reading of the waiver clause together with paragraph 2 on the reverse side of the agreement would preclude such coverage.

n4 No warnings, either orally or posted in the truck, were given to the plaintiff with respect to the height or width of the truck.

On the same day of the collision, the defendant charged the plaintiff's credit card (Visa) the following amounts: $ 115.00, n5 $ 345.00, $ 2875.00, $ 3,450.00 and $ 5,750.00, totaling $ 12,535.00. The defendant failed to advise the plaintiff of the charges. When these charges came to the attention of the plaintiff on March 27, 2001 at the time he received the Visa invoice, he protested them to Visa and except for the $ 115.00 charge, they were removed. Visa subsequently reinstated the following charges: $ 345.00, [*6] $ 2,875.00, and $ 3450.00, totaling $ 6,670.00.

n5 Although the evidence was not clear, the $ 115.00 charge appears to be the cost of the rental and waiver for one day and that amount is not in dispute.

The agreement in this case is a classic example of a contract of adhesion. n6 "The concept that a contract of adhesion should be interpreted and enforced differently from an ordinary contract has evolved from cases which have involved contractual provisions drafted and imposed by a party enjoying superior bargaining strength--provisions which unexpectedly and often unconscionably limit the obligations and liability of the party drafting the contract." (Internal citation omitted.) *Madden v. Kaison Foundation Hospitals, 17 Cal. 3d 699, 552 P.2d 1178, 1185, 131 Cal. Rptr. 882 (1976).*

n6 The concept of "contract of adhesion" is a first cousin to that of "procedural unconscionability." See *Smith v. Mitsubishi Motors Credit of America, Inc., 247 Conn. 342, 349, 721 A.2d 1187 (1998).*

[*7]
The terms of the agreement were not subject to negotiation and the waiver was presented on an accept or decline basis. The print on the agreement, and in particular the reverse side, was difficult to read. Unlike the waiver clause there was no requirement that the renter initial his acceptance or rejection of any section on the reverse side of the agreement. Although the waiver provides that it "does not cover loss or damages resulting from any violation of paragraph 1 or 2 of this agreement" it makes no reference that those paragraphs can be found on to the reverse side of the agreement. The wording of the waiver, without reading paragraphs 1 and 2 on the reverse side, would lead a person to believe that all losses would be covered when it contained the following language "-0- amount per occurrence *regardless of the cause*." (Emphasis supplied.) Indeed, if the plaintiff was

a professor of law he could not be expected to be aware of these inconspicuous parts of the agreement upon which the defendant relies.

Like the insurance contract in *Aetna Casualty & Surety Co. v. Murphy, 206 Conn. 409, 416, 538 A.2d 219 (1988)*, "there can be no question that the . . . [agreement] in [*8] this case is a 'contract of adhesion.' That term was first introduced into American legal vocabulary by Professor Edwin Patterson, who noted that life insurance contracts are contracts of adhesion because 'the contract is drawn up by the insurer and the insured, who merely "adheres" to it, has little choice as to its terms . . .' Standardized contracts of insurance continue to be prime examples of contracts of adhesion, whose most salient feature is that they are not subject to the normal bargaining processes of ordinary contracts. The fact that the notice provisions in the . . . insurance policy were an inconspicuous part of a printed form supports the characterization of these clauses as a 'contract of adhesion.' Nothing in the record suggests that they were brought to . . . [the plaintiff's] attention or that, if they had been, their terms would have been subject to negotiation." (Citations and internal quotation marks omitted in part.)

Accordingly, to limit the waiver, because of a prohibition on the reverse side and thereby nullify the protection that the plaintiff had assumed he purchased when he made the election would, in the words of the Supreme Court of Connecticut, be [*9] "revolting to the moral sense, and contrary alike to the salutary principles of law and a sound public policy." (Citation and internal quotation marks omitted.) *Malone v. Santora, 135 Conn. 286, 293, 64 A.2d 51 (1949).* (In *Malone*, a bailee attempted to limit his liability for negligence by having printed on a claim check given to the car owner the following: "Liability. Management assumes no responsibility of any kind. Charges are for Rental of space. From 8 a.m. to 11 p.m. Not responsible for articles left in or on car. Agree to the within terms." *Id. p. 288.* The court rejected this limitation on liability, although not on the theory that it was a contract of adhesion, but, rather, on the basis that a bailee cannot limit his liability for his own negligence.) Surely, when the annualized cost of the collision coverage in the amount of $5,077.80 is put into the equation, the limitation in this case becomes even more "revolting to the moral sense." n7

n7 The defendant, with no reference to any authority, also argues that even without the aid of the second page of the agreement the collision would not apply to damage caused by striking an overpass because "collision insurance has traditionally meant a collision with another vehicle." Nevertheless, collision as used in the contract has its ordinary meaning, to wit: "Act of striking two bodies, the meeting and mutual striking or clashing of two or more moving bodies or any moving body with a stationary body." Ballentine's Law Dictionary, 3rd ed.

[*10]
The court finds that the damage to the truck is covered by the waiver and the plaintiff is entitled to recover compensatory damages in the amount of $6,670.00 plus interest at the rate of 8% per annum n8 which sum amounts to approximately $1,222.00, in all $7,870.00.

n8 The parties agreed to 8%.

The plaintiff also argues that the charges to his Visa card by the defendant constituted a violation of Connecticut Unfair Trade Practice Act (CUTPA), General Statutes § 42-110b. "The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce, and whether a practice is unfair depends upon the finding of a violation of an identifiable public policy. CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act, [General Statutes] § 42-110b(a), states merely that no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct [*11] of any trade or commerce. Trade or commerce, in turn, is broadly defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state. *General Statutes § 42-110a(4).* The entire act is remedial in character; *General Statutes § 42-110b(d);* and must be liberally construed in favor of those whom the legislature intended to benefit . . ." (Citations and internal quotation marks omitted.) *Willow Springs Condo. Ass'n, v. Seventh BRT Dev. Corp., 245 Conn. 1, 42, 717 A.2d 77 (1998).*

"It is well settled that 'in determining whether a practice violates CUTPA we have adopted the criteria set out in the 'cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra [*12] of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral,

unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law." (Citations and internal quotation marks omitted.) *Id. p. 42-43.*

The manager of the defendant, Paul Kozlowski conceded that although the defendant had permission to use the credit card for the cost of the rental, it did not have the specific permission from the plaintiff to charge his credit card for the repairs to the truck. The defendant relies on the reverse side of the agreement which provided the following: "10. Credit charges: in the event rentee directs rentor to bill charges hereunder to any other person or organization, such person or organization and rentee shall be jointly and severally liable [*13] for all such charges. RENTEE EXPRESSLY AUTHORIZES RENTOR TO PROCESS A CREDIT CARD VOUCHER, IF ANY, IN HIS NAME FOR CHARGES MADE HEREUNDER." n9 This clause must be read as providing joint and several liability for *authorized* credit charges. Furthermore, it is part of contract of adhesion and must be stricken with the other provisions.

> n9 This capitalized sentence was in type of approximately one-sixteenth of an inch.

Even if the court were to ignore that the agreement was a contract of adhesion, there were other egregious practices by the defendant which would afford the basis for CUTPA violation. Kozlowski conceded that he did not know the basis for the February 20, 2001 charges. Second, the charge to the Visa card, whether it be those on February 20, 2001, in the total amount of $ 12,420.00 or the adjusted amount of $ 6,670.00 has never been justified. The defendant's own estimate indicates the cost of repairs was $ 5,750.00. The use of the plaintiff's Visa card for the property damage for sums in excess [*14] of the costs of the repairs would also constitute a CUTPA violation.

Finally, when the plaintiff sought an explanation of the charges from the defendant at its place of business in New Haven where he rented the truck, not only was he not given an explanation, but he was merely handed a business card which read: "Acme Rent-A-Car, 22 Lafayette Place # 13, Greenwich, Connecticut 06830, Attn: Legal Dept. No Phone Calls Accepted" (legal card). This conduct of refusing to explain the charges and answering his inquiry by referring him to its "Legal Department" which is located approximately 46 miles from New Haven with "no phone calls accepted" which the defendant admitted was a vacant office also constitutes a violation of CUTPA.

The court further finds that the legal card was a common practice of the defendant. The defendant admitted, because of its practices, there were many irate customers and by using the card as a shield, the defendant was able to "defuse a potential disaster." n10

> n10 Testimony of Kozlowski.

[*15]

The court finds that the defendant's unauthorized use of the plaintiff's Visa card, the charging of almost double the amount the defendant could possibly justify even if it was entitled to damages for the vehicle and the use of the legal card to answer complaints constituted CUTPA violations entitling the plaintiff to punitive damages and attorneys fees. n11

> n11 The court also wishes to make it clear that each one of these practices would constitute a CUTPA violation.

In awarding punitive damages, the court is mindful of the constitutional limitations. Recently, the Supreme Court of the United States reviewed these limitations. The *Due Process Clause* "prohibits the imposition of grossly excessive or arbitrary punishments . . ." *State Farm Mutual v. Campbell, 155 L. Ed. 2d 585, 123 S. Ct. 1513 (2003).* The court emphasized that the guidelines set forth in *BMW of North American, Inc. v Gore, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996),* were controlling in determining the upper limits of such an award. Although [*16] *Gore* focused on an award by a jury and furnished guidelines for the trial judge in determining whether the amount awarded for punitive damages violated the *Due Process Clause*, those guidelines equally apply to an award by the trial court. These factors are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id., 575.*

The defendant's conduct of the unauthorized use of the plaintiff's credit care was reprehensible. This was further aggravated when the amount for which it was

used far exceeded the claim of the defendant--that is, more than double. The court finds this conduct of bilking customers was not an isolated instance. This was further exacerbated when the plaintiff was furnished with the legal card, don't call but at best write. The person who traveled the 46 miles from New Haven to Stamford, would have found an empty office. The court finds that three times the amount initially charged by the [*17] defendant to the plaintiff's Visa, which could not be justified as a result of the defendant's contract having been trimmed as contract of adhesion, would be the appropriate sum for punitive damages. Accordingly, the court awards $ 37,260.00 in punitive damages.

The plaintiff is also entitled to the attorneys fees he incurred in bringing the action under CUTPA. The attorney representing the plaintiff in this matter expended 48.8 hours and she currently bills at $ 250.00 per hour. The court awards $ 12,200 for attorneys fees and costs incurred in the amount of $ 410.57.

In sum the court awards compensatory damages in the amount of $ 6,670, punitive damages in the amount of $ 37,260, attorneys fees in the amount of $ 12,200, in all $ 56,130, plus costs of $ 410.57.

Robert I. Berdon

Judge Trial Referee